**UNITED STATES of America Appellee,**

v.

**Vernon SNYPE, Defendant–Appellant,**

**Marisa Hicks, Defendant.**

Nos. 04–3299–cr(L), 04–3551–cr(CON), 04–4985–cr(CON).

United States Court of Appeals, Second Circuit.

Argued: June 14, 2005.

Decided: March 17, 2006.

---

Kerry A. Lawrence (Theodore S. Green, on the brief), Briccetti, Calhoun & Lawrence, LLP, White Plains, New York, for Defendant–Appellant.

Joshua Klein, Assistant United States Attorney (Karl Metzner, Assistant United States Attorney, on the brief), for David N. Kelley, United States Attorney for the Southern District of New York, New York, New York, for Appellee.

Before: CABRANES and RAGGI, Circuit Judges, and SAND, District Judge.[1]

REENA RAGGI, Circuit Judge.

Defendant Vernon Snype appeals from a judgment of conviction entered on June 1, 2004, following a jury trial in the United States District Court for the Southern District of New York (Denny Chin, *Judge* ), at which he was found guilty on one count of conspiracy to commit bank robbery in violation of 18 U.S.C. §§ 371, 2113.[2] Presently incarcerated, serving a term of life imprisonment, Snype challenges his conviction on the following grounds: (1) the receipt into evidence of a co-conspirator's plea allocution violated his Sixth Amendment right to confrontation as delineated in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); (2) the receipt into evidence of items seized during a warrantless search of the apartment where Snype was arrested violated the Fourth Amendment; (3) the receipt into evidence of Snype's marriage certificate violated due process because the jury inferred a prior felony conviction from the certificate's listing of Snype's home address as "Fishkill CF"; (4) the district court erred in failing to instruct the jury on an alternative unindicted charge of being an accessory after the fact to robbery, *see* 18 U.S.C. § 3; and (5) the imposition of a lifetime prison sentence pursuant to § 70001(2) of the Violent Crime Control and Law Enforcement Act of 1994 (commonly referred to as the "three-strikes" law), Pub.L. No. 103–322, 108 Stat. 1796, 1982–84, codified as amended at 18 U.S.C. § 3559(c), (a) was not supported by the record evidence, (b) violated his Sixth Amendment right to have findings of fact resulting in a higher maximum sentence made by a jury rather than the trial court, (c) was the result of an unconstitutional shifting of the burden of proof to the defendant, and (d) constituted cruel and unusual punishment in violation of the Eighth Amendment.

For the reasons discussed in this opinion, we conclude that the alleged errors are without merit or, in any event, harmless. Accordingly, we affirm the judgment of conviction.

## I. *Factual Background*

### A. *The First Union Bank Robbery*

Shortly after 10:00 a.m. on Saturday, July 6, 2002, two masked men entered the Tuckahoe Road branch of First Union Bank in Yonkers, New York, and, at gunpoint, robbed the bank of approximately $20,000. Cornell McCloud, who participated in the robbery as a lookout and who would subsequently testify for the prosecution, identified the armed robbers as William Partlow and the defendant Vernon Snype.[3] McCloud would also implicate Snype's wife, Marisa Hicks, and Hicks's cousin, Marlo White, as confederates in the robbery conspiracy.[4]

---

1. The Honorable Leonard B. Sand, of the United States District Court for the Southern District of New York, sitting by designation.

2. The jury was unable to reach a verdict on substantive charges of bank robbery, *see* 18 U.S.C. §§ 2113(a); aggravated bank robbery, *see id.* §§ 2113(d); and using a firearm in relation to aggravated bank robbery, *see id.* § 924(c), prompting the district court to declare a mistrial and to sever those counts for retrial following resolution of this appeal.

3. McCloud testified pursuant to a cooperation agreement whereby he pleaded guilty to conspiratorial and substantive charges of aggravated bank robbery. Because Partlow and Snype were masked, no teller or bank customer was able to identify them as the robbers.

4. Shortly before Snype's trial, Marisa Hicks pleaded guilty to conspiratorial and substantive charges of aggravated bank robbery,

Inside the bank, Snype and Partlow shouted at customers to get down on the floor and not to "move or else we'll shoot you." Trial Tr. 36. One of the robbers then vaulted the counter and, pointing his gun in turn at each teller, demanded that money be placed into a bag. The robber instructed one teller, who had the money at his station in a box bearing his name and address, to place the entire box in the robbers' bag.

## B. The Robbers' Shootout with the Police

While the robbery was in effect, McCloud saw a police truck, which was in fact responding to a radio alert about the crime, approach the bank. As previously agreed among the confederates, McCloud promptly communicated his observation to Hicks, using a telephone programmed as a walkie-talkie.[5] Moments later, McCloud saw Snype and Partlow run out of the bank, climb into the same blue SUV in which the pair had arrived, and speed away.[6] The police truck and other police vehicles gave chase as the SUV entered onto the New York State Thruway, traveling at speeds in excess of 85 miles per hour. As police unsuccessfully attempted to force the SUV to the side of the road, shots were fired from that vehicle at the officers. Eventually, the SUV crashed, and the robbers fled on foot in opposite directions. The police cornered Partlow in some bushes and demanded his surrender. As Partlow stood up, he defiantly announced that he intended to "take one of

you guys with me," prompting the police to shoot and kill him. Trial Tr. 279.

## C. Snype Reunites with the Remaining Conspirators

After Snype fled the crash scene, he contacted McCloud on the walkie-talkie and arranged to meet him at a location in the Bronx. There, Snype recounted to McCloud, Hicks, and White the events of the. chase and shootout. At Snype's direction, McCloud and White drove to the crash site to look for Partlow, but upon seeing only police officers at the scene, they returned to the Bronx meeting place. From there, the four confederates drove to Tuckahoe Road, where Snype retrieved his keys and wallet from a car belonging to Partlow.

The following day, July 7, 2002, McCloud was arrested in possession of the walkie-talkie used in the robbery. Also on July 7, Hicks and White traveled to a storage facility in New Jersey, where Hicks leased storage bin number 466 with access code 7074.

## D. Snype's Arrest and the Seizure of Incriminating Evidence

Soon after McCloud's arrest, agents of the Federal Bureau of Investigation ("FBI") obtained an arrest warrant for Snype on charges of armed bank robbery. At approximately 10:15 p.m. on July 11, 2002, federal and local law enforcement officers forcibly entered a Queens apartment belonging to Jennifer Bean and there arrested Snype. On the floor of the bed-

---

while Marlo White pleaded guilty to a single substantive count of bank robbery.

5. Telephone records showed that all five conspirators were in constant contact with one another in the hours during the July 6, 2002 robbery and throughout that day.

6. At approximately 8:00 a.m. on July 6, 2002, this blue SUV had been stolen from a Bronx parking garage by two armed men. A garage attendant, who testified that he got a good look at only one of the robbers' faces, subsequently identified that person from a photo spread as William Partlow. The witness was unable to identify Snype from either a photo spread or line-up.

room where Snype was found, arresting officers saw, among other things, a knapsack, a red plastic bag, and the box taken from one of the First Union Bank tellers during the robbery. The box was open and, inside, bundles of cash were plainly visible.

After removing Snype from the apartment, officers sought Bean's consent to search her residence. At a suppression hearing, Bean testified that, despite the initial forcible entry into her home, she voluntarily gave both an oral and written consent to search, although she knew she was not required to do so. She explained that she had never met Snype, whom she knew only as "Vee," before July 11, 2002, when her boyfriend asked if Snype could spend the night at her apartment.

Acting on Bean's consent, officers seized the teller's box that they had first observed at the time of Snype's arrest, finding it to contain $7,761 in cash wrapped in money bands with markings identifying both the Tuckahoe Road branch of First Union Bank and the specific tellers from whom the money had been taken. From the previously observed knapsack, they seized another $13,000, also in bundles with First Union money bands; two loaded firearms; and various documents, including legitimate and fraudulent identifications as well as a business card for a New Jersey storage facility with the number "466" written on both sides of the card. From the red plastic bag on the bedroom floor, agents seized, among other things, a lease for storage bin number 466, access code number 7074, at the New Jersey facility.

## II. *Discussion*

### A. *The Admission of Marlo White's Plea Allocution to Prove the Charged Conspiracy Was Harmless Error*

To prove the charged robbery conspiracy, the government offered, among other evidence, the redacted plea allocution of Marlo White as a statement against penal interest. *See* Fed.R.Evid. 804(b)(3).[7]

7. White's allocution was redacted to substitute the neutral words "woman" and "man" for the names of Marisa Hicks and Snype, thereby ensuring compliance with *Williamson v. United States,* 512 U.S. 594, 599–601, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) (construing Federal Rule of Evidence 804(b)(3) to permit only self-inculpatory statements to be admitted into evidence). The portions of the allocution read to the jury state:

> THE COURT: Ms. White, tell me what you did.
> THE DEFENDANT [Ms. White]: I agreed to ride to New York with another woman.
> THE COURT: Yes.
> THE DEFENDANT: To be a lookout.
> THE COURT: You told me you were going to be a lookout?
> THE DEFENDANT: Yes.
> THE COURT: Did you know that you were going to be a lookout for a bank robbery?
> THE DEFENDANT: Yes.
> THE COURT: You knew that when you got there?
> THE DEFENDANT: Yes.

> THE COURT: From what the woman told you?
> THE DEFENDANT: Yes, when she was on the phone with a man.
> THE COURT: Once you learned that there was going to be a bank robbery did you continue to participate as a lookout?
> THE DEFENDANT: Yes.
> THE COURT: And was it your intention to assist in the bank robbery to be like a lookout?
> THE DEFENDANT: Yes.
> THE COURT: And when you did that, did you know that what you were doing was wrong and illegal?
> THE DEFENDANT: Yes.
> THE COURT: Before you got there you knew that it was going to be some kind of a robbery, is that true?
> THE DEFENDANT: Yes.
> THE COURT: And then at some point after you got there and as you were sitting in the car, you learned that this was going to be a bank robbery?
> THE DEFENDANT: Yes.

Snype, who unsuccessfully objected to this evidence, contends that the admission of White's allocution violated his Sixth Amendment right to confrontation. *See* U.S. Const. amend. VI; *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. We agree but conclude that no new trial is warranted because the error was harmless.

### 1. *The Crawford Error*

■ Preliminarily, we observe that, at the time of Snype's trial, the law in this circuit permitted an unavailable co-conspirator's plea allocution to be offered to prove the existence of a conspiracy and conduct in furtherance thereof on the rationale that the circumstances of an allocution rendered the statement sufficiently reliable. *See United States v. Dolah*, 245 F.3d 98, 104–05 (2d Cir.2001); *United States v. Moskowitz*, 215 F.3d 265, 269 (2d Cir.2000) (*per curiam*). Consistent with this precedent, the district court carefully instructed the jury that it could consider White's allocution only on two issues: "whether there was a conspiracy to commit bank robbery and what, if anything, Ms. White did to further the objects of that conspiracy, assuming you find that it existed." Trial Tr. 303; *see id.* at 421–22. The court specifically instructed the jury that White's allocution could not be used to determine Snype's membership in the charged conspiracy:

> The question of whether Mr. Snype was a member of that conspiracy is an issue that you will have to decide based on other evidence presented at this trial. In other words, the statements of Ms. White do not name Mr. Snype, and you cannot base your verdict as to whether

THE COURT: And even after you learned that it was going to be a bank robbery, you continued to participate as a lookout?

he participated on the statements of Ms. White.

*Id.* at 304; *see id.* at 421–22.

In the interim between the jury's guilty verdict and Snype's sentencing, the Supreme Court ruled that the Confrontation Clause did not permit such out-of-court statements to be received in evidence. In *Crawford v. Washington*, the Court explained that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." 541 U.S. at 68–69, 124 S.Ct. 1354. *Crawford* specifically criticized our decisions in *Dolah* and *Moskowitz*, as well as similar rulings by our sister circuits and state courts. *See id.* at 63–65, 124 S.Ct. 1354. Thus, the government concedes, as it now must, that the admission of White's plea allocution was error. *See United States v. Bruno*, 383 F.3d 65, 78–79 (2d Cir.2004).

### 2. *Harmless Error*

■ A *Crawford* error does not, however, automatically require that a conviction be vacated. The law recognizes that such errors may sometimes be harmless. *See United States v. McClain*, 377 F.3d 219, 222 (2d Cir.2004). To establish harmlessness in this context, the government must "'show beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* (quoting *United States v. Casamento*, 887 F.2d 1141, 1179 (2d Cir.1989) (internal quotation marks omitted)); *see United States v. Dhinsa*, 243 F.3d 635, 649 (2d Cir.2001). We conclude that the government here carries this burden because, as already noted, White's allocution was admitted only to prove the existence of the

THE DEFENDANT: Yes.
Trial Tr. 302–03.

charged conspiracy and that element of the crime of conviction was so overwhelmingly established by other trial evidence as to be essentially conceded by the defense.

Federal law is clear that a conspiracy is "an agreement among two or more persons, the object of which is an offense against the United States." *United States v. Svoboda,* 347 F.3d 471, 476 (2d Cir. 2003). Even without White's allocution, the government offered compelling evidence of such an illicit agreement in this case. Specifically, a number of bank customers and employees provided detailed eyewitness testimony that *two* armed men acted jointly in robbing First Union Bank on the morning of July 6, 2002. Further, an admitted participant in the robbery scheme, Cornell McCloud, identified a total of five co-conspirators, two of whom entered the bank to commit the robbery while three acted as lookouts. A wealth of circumstantial evidence corroborated this direct proof of conspiracy. For example, two hours before the bank robbery, two armed men (Partlow being one of them) stole the SUV that was used as the getaway car from a parking garage. Two men were in that car—one driving and the other firing shots from the passenger window—as police chased it fleeing from the bank. Further, telephone records showed extensive communication among the five conspirators identified by McCloud on the morning of July 6, 2002. In sum, because the totality of this evidence overwhelmingly establishes the charged robbery conspiracy, we can conclude beyond a reasonable doubt that White's allocution did not contribute to the jury's finding on this element of the crime.

Indeed, precisely because this other evidence of the existence of the charged conspiracy was so overwhelming, Snype sensibly did not dispute the element at trial. In both his opening and closing arguments, Snype's counsel acknowledged that "two men" jointly robbed the bank, a fact not even mentioned by White in her plea allocution. Trial Tr. 355; *see also id.* at 30 (referencing "the second person" robbing the bank); *id.* at 355 (referencing "two bank robbers"). Instead, the defense focused on the sufficiency of the government's proof of Snype's participation in the conspiracy. Counsel argued that the "other robber" joining Partlow inside the bank was not Vernon Snype, but Cornell McCloud: "[I]t was Cornell McCloud that was *the second person* who was the bank robber that day, not Vernon Snype." *Id.* at 30 (emphasis added); *see also id.* at 355 ("[T]here is far more evidence to suggest that Cornell McCloud was the *other* bank robber." (emphasis added)). The fact that Snype essentially conceded the existence of the charged conspiracy thus reinforces our conclusion that the admission of White's plea allocution to prove this element was harmless error.

In urging otherwise, Snype asserts that, "notwithstanding the district court's limiting instruction," the jurors "could" have used White's allocution for a second, impermissible purpose, *i.e.,* to infer his participation in the charged conspiracy. Appellant Br. 22. Snype submits that the jurors might have reasoned that, because White and Hicks were cousins, Hicks must have been the "woman" referred to in White's allocution from whom she learned of the robbery plan. Further, from the fact that Hicks and Snype were married, as well as the telephone records in evidence, the jury might have inferred that Snype was the "man" with whom Hicks was speaking when White was told of the robbery plan. *See id.* at 22–23.

▮ The argument is unconvincing. As the Supreme Court has frequently observed, the law recognizes a strong presumption that juries follow limiting instructions. *See Zafiro v. United States,* 506 U.S. 534, 540–41, 113 S.Ct. 933, 122

L.Ed.2d 317 (1993) (" '[J]uries are presumed to follow their instructions.' " (quoting *Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987))); *Spencer v. Texas,* 385 U.S. 554, 562, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967) ("[T]he jury is expected to follow instructions in limiting . . . evidence to its proper function."); *accord United States v. Stewart,* 433 F.3d 273, 307 (2d Cir.2006) (noting the "well-settled proposition" that jurors are presumed to follow limiting instructions). While the presumption can "evaporate[ ] where there is an overwhelming probability that the jury will be unable to follow" a limiting instruction that demands "mental acrobatics" of the jurors, *United States v. Jones,* 16 F.3d 487, 493 (2d Cir. 1994), that is not this case. Indeed, it is Snype who proposes mental acrobatics in suggesting a multi-step course of deliberations that the jury "could" have pursued from White's allocution without any prompting by counsel and in violation of the court's instructions. Such a hypothesis hardly qualifies as an "overwhelming probability." *Id.*

In sum, although we find that the admission of White's plea allocution was error under *Crawford,* because we have no reason to conclude that the jury failed to follow the district court's instruction limiting consideration of that evidence to the element of conspiracy, and because the admissible evidence of conspiracy was plainly overwhelming, we conclude that this *Crawford* error was harmless beyond a reasonable doubt.

B. *Items Seized During a Warrantless Search of Bean's Apartment Were Admissible*

Snype contends that evidence seized during the warrantless search of Jennifer

Bean's apartment should have been suppressed. He submits that the district court erred in finding that Bean's consent to search her apartment (1) was voluntary, (2) was not tainted by an initial illegal entry onto the premises, and (3) could authorize the search of Snype's belongings.[8] The arguments are uniformly without merit.

1. *Bean's Consent to Search Was Voluntary*

a. *The Consent Exception to a Warrantless Search*

██ "The Fourth Amendment protects the right of private persons to be free from unreasonable government intrusions into areas where they have a legitimate expectation of privacy." *United States v. Newton,* 369 F.3d 659, 664 (2d Cir.2004); *see* U.S. Const. amend IV. As an overnight guest in Bean's apartment, Snype shared in his host's legitimate expectation of privacy in the premises. *See Minnesota v. Olson,* 495 U.S. 91, 98, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); *accord United States v. Fields,* 113 F.3d 313, 320 (2d Cir.1997).

██ Although warrantless searches of private property are generally presumed to be unreasonable, the law recognizes certain exceptions, for example, when the search is conducted pursuant to the consent of an authorized person. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Lewis,* 386 F.3d 475, 481 (2d Cir.2004) (recognizing that where authorized party consents to search "neither a warrant nor probable cause is necessary"). "The Fourth and Fourteenth

---

**8.** Although Snype's trial was conducted by Judge Chin, these findings were made by Judge John S. Martin.

Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth v. Bustamonte,* 412 U.S. at 228, 93 S.Ct. 2041. Thus, when, as in this case, the government relies on consent to justify a warrantless search, it bears the burden of proving by a preponderance of the evidence that the consent was voluntary. *See United States v. Isiofia,* 370 F.3d 226, 230 (2d Cir.2004). Voluntariness is determined by reference to the " 'totality of all the circumstances.' " *Id.* at 231 (quoting *Schneckloth v. Bustamonte,* 412 U.S. at 227, 93 S.Ct. 2041). While more than "mere acquiescence in a show of authority" is necessary to establish the voluntariness of a consent, *United States v. Wilson,* 11 F.3d 346, 351 (2d Cir.1993), the fact that a person is in custody or has been subjected to a display of force does not automatically preclude a finding of voluntariness, *see United States v. Ansaldi,* 372 F.3d 118, 129 (2d Cir.2004) (holding that use of guns to effectuate arrest and handcuffing of defendant did not render his consent to search his home involuntary).

█ In considering a challenge to a district court finding of consent, we are obliged to view the evidence in the light most favorable to the government. *See United States v. Ansaldi,* 372 F.3d at 129. We will not reverse a finding of voluntary consent except for clear error. *See United States v. Isiofia,* 370 F.3d at 232. We find no such error in this case.

b. *The Evidence Demonstrating Bean's Voluntary Consent*

█ Snype submits that, in light of the forcible entry into Bean's apartment, her subsequent consent to search could not reasonably be deemed voluntary. To be sure, the facts required the district court's careful consideration. On the one hand,

Bean's home was forcibly entered by a heavily armed SWAT team that initially secured her and her boyfriend in handcuffs and raised the possibility of taking the couple into custody while placing Bean's young daughter in protective care. On the other hand, Bean testified that she perceived these events as "way, way before" her consent, which she unqualifiedly described as "voluntary." Hearing Tr. 17, 23. Bean's perception finds ample support in the circumstances occurring between the forcible entry and her consent. In that interval, (1) the SWAT team left the premises, (2) Snype was arrested and removed from the apartment, (3) Bean was allowed to call her sister to come help with her daughter, and (4) the remaining officers explained the circumstances to her so that she felt they were treating her "with respect." *Id.* at 18.

These facts are markedly distinguishable from those in *United States v. Mapp,* a case in which this court refused to find a consent to search voluntary where it followed a 2:00 a.m. forcible entry into a home without any "steps to establish an atmosphere of relative calm ... conducive to the making of a knowing and intelligent decision." 476 F.2d 67, 78 (2d Cir.1973); *see also id.* (noting further that officer's statement was fairly construed as demand for particular piece of incriminating evidence rather than solicitation of consent to search for that item). Here, in contrast to *Mapp,* numerous steps were taken that did restore calm to Bean's home before she consented to any search. Thus, as Bean testified, when she gave her consent, she did not do so because she felt threatened in any way by the law enforcement officers remaining on the premises, nor because she feared the consequences of a refusal for herself or her daughter. Indeed, she knew she was not required to give consent.[9] .

On the totality of this evidence, we conclude that the district court did not clearly err in finding Bean's consent to search her apartment voluntary.

### 2. Bean's Consent Was Untainted by Any Illegality in the Initial Apartment Entry

### a. The Separate Taint Inquiry

■ Snype asserts that, even if Bean's consent to search her apartment was voluntary, it was necessarily tainted by the initial illegal entry into her apartment. When a consent to search follows an illegal entry, this circuit requires the government to show more than the voluntariness of the consent; it must also demonstrate that "the taint of the initial entry has been dissipated" in order to admit evidence seized following the illegal entry. *United States v. Oguns*, 921 F.2d 442, 447 (2d Cir.1990) (internal quotation marks omitted). *Oguns*'s identification of taint and voluntariness as distinct inquiries in evaluating the validity of certain consents derives from two Supreme Court decisions: *Wong Sun v. United States*, which held that evidence seized after an illegal search must be suppressed unless the government shows that it, in fact, resulted from "an intervening independent act of free will" sufficient "to purge the primary taint of the unlawful invasion," 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); and *Brown v. Illinois*, which held that, where an inculpatory statement follows an unlawful arrest, a finding of voluntariness under the Fifth Amendment (based on *Miranda* warnings) does not obviate the need to make a separate Fourth Amendment determination as to whether the statement was " 'sufficiently an act of free will to purge the primary taint.' " 422 U.S. 590, 602, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (quoting *Wong Sun, id.*).

A number of our sister circuits similarly construe *Wong Sun* and *Brown* to require a showing of attenuation as well as voluntariness for a consent following an illegal search or seizure to avoid the consequences of the exclusionary rule. *See United States v. Washington*, 387 F.3d 1060, 1072 n. 12 (9th Cir.2004) ("For purposes of the Fourth Amendment, a determination that a consent was voluntarily made only satisfies a threshold requirement. The mere fact of voluntariness does not mean that a consent is not tainted by a prior Fourth Amendment violation." (internal quotation marks and citations omitted)); *United States v. Robeles–Ortega*, 348 F.3d 679, 681 (7th Cir.2003) ("Where the search following the illegal entry is justified based on alleged consent, courts must determine whether that consent was voluntary, and in addition the court must determine whether the illegal entry tainted that consent."); *United States v. Lopez–Arias*, 344 F.3d 623, 629 (6th Cir.2003) ("[N]ot only must the consent be valid, i.e. voluntary . . ., but the causal chain between the illegal seizure and the consent must be broken to avoid the consequences of the exclusionary rule."); *United States v. Santa*, 236 F.3d 662, 676 (11th Cir.2000) ("[T]he voluntariness of consent is only a threshold requirement; a voluntary consent to search does not remove the taint of an illegal seizure."). *But see United States v. Mendoza–Salgado*, 964 F.2d 993, 1013 (10th Cir.1992) ("Our circuit does not

---

9. Snype urges us to construe this statement to reflect not Bean's recognition of her Fourth Amendment rights, but a belief that law enforcement officers would search her apartment whether or not she gave her consent.

We find no support in the record for Snype's proposed construction, which is, in fact, at odds with Bean's overall testimony as to the voluntariness of her consent.

believe that under *Wong Sun* or *Brown,* the Government is required to show attenuation beyond a finding of voluntary, valid consent under Fourth Amendment standards." (internal quotation marks omitted)).

Following *Oguns,* we consider whether the initial entry into Bean's apartment was unlawful so as to require a separate inquiry into taint.

b. *The Claimed Illegal Entry*

■ Snype asserts that the initial entry into Bean's apartment was unlawful under the Fourth Amendment because it was not supported by a search warrant. The government responds that Snype cannot raise this complaint because the entry, at least as it pertained to him, was supported by a warrant for his arrest. *See Payton v. New York,* 445 U.S. 573, 602–03, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (holding that arrest warrant permits police to enter residence of person named therein to make arrest). Further, the government submits that the entry was supported by exigent circumstances. *See, e.g., United States v. MacDonald,* 916 F.2d 766, 769–70 (2d Cir.1990) (*en banc*); *accord United States v. Fields,* 113 F.3d 313, 322–23 (2d Cir.1997).

As an initial matter, we note that Snype's search warrant challenge relies on *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), in which the Supreme Court ruled that a search warrant was necessary to protect the privacy interests of a third party whose home was searched for the subject of an arrest warrant. At the same time, however, the Court specified that its ruling applied only to challenges raised by the third-party resident. It left open the question "whether the subject of an arrest warrant can object to the absence of a search warrant when he is apprehended in another person's home." *Id.* at 219, 101 S.Ct. 1642.

Although this court has yet to rule on that issue, a number of our sister circuits have held that *Steagald* protection does not extend to arrestees in Snype's position. They reason that (a) Fourth Amendment rights are personal and cannot be asserted vicariously, and (b) requiring police who already hold an arrest warrant for a suspect to obtain a search warrant before they can pursue that suspect in a third party's home would grant the suspect broader rights in the third party's home than he would have in his own home under *Payton. See United States v. Agnew,* 407 F.3d 193, 196–97 (3d Cir.2005); *United States v. Kaylor,* 877 F.2d 658, 663 n. 5 (8th Cir.1989); *United States v. Underwood,* 717 F.2d 482, 483–86 (9th Cir.1983) (*en banc*); *United States v. Buckner,* 717 F.2d 297, 299–300 (6th Cir.1983). *But see United States v. Weems,* 322 F.3d 18, 23 n. 3 (1st Cir.2003) (assuming, without deciding, that arrestee may object to police entry into third party's home without a search warrant). We need not here decide whether to adopt this reasoning because, even if we were to do so, Snype might still be entitled to a taint inquiry.

This is because an apparent gap in the hearing record does not permit us to conclude that either *Payton* or exigency supports the initial entry. Both theories require proof of a common fact to support entry into Bean's home without a search warrant: a reasonable basis for believing that Snype was then on the premises. *See Payton v. New York,* 445 U.S. at 603, 100 S.Ct. 1371 (holding that arrest warrant can support entry into suspect's residence

"when there is reason to believe the suspect is within"); *see, e.g., United States v. MacDonald,* 916 F.2d at 769–70 (identifying such belief as a relevant factor to support exigency entry).[10] In its written opposition to Snype's suppression motion, the government proffered that an unidentified cooperating witness had supplied the necessary basis for such belief, but, somehow, it failed to offer any evidence at the suppression hearing to support this claim. The omission may well reflect only the parties' focus on other contested issues. Nevertheless, in the absence of an adequate record to support this reasonable belief requirement of both *Payton* and exigent circumstances, we cannot determine the lawfulness of the initial entry on this appeal. Instead, like the district court, we assume the contrary and proceed to consider whether Bean's consent was sufficiently attenuated from the entry to be deemed the product of "'an act of free will.'" *United States v. Oguns,* 921 F.2d at 447 (quoting *Brown v. Illinois,* 422 U.S. at 603, 95 S.Ct. 2254 (quoting *Wong Sun v. United States,* 371 U.S. at 486, 83 S.Ct. 407)).

**10.** In *MacDonald,* this court, sitting *en banc,* identified the factors generally relevant to determining whether exigent circumstances justify a warrantless search:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause ... to believe that the suspect committed the crime; (4) *strong reason to believe that the suspect is in the premises being entered;* (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

916 F.2d at 769–70 (emphasis added). Because these factors are illustrative rather than exhaustive, the presence or absence of any single factor is not dispositive. *See id.* at 770.

In this case the record, in fact, supports five of the six factors. The offense for which

c. *The Record Convincingly Demonstrates that Any Taint from the Initial Entry Had Dissipated by the Time of Bean's Consent*

As this court has previously observed, the question of whether a person's statement has been purged of the taint of prior official illegality "does not hinge on a simple 'but for' analysis, but rather 'must be answered on the facts of each case.'" *United States v. Thompson,* 35 F.3d 100, 105 (2d Cir.1994) (quoting *Brown v. Illinois,* 422 U.S. at 603, 95 S.Ct. 2254). The Supreme Court has identified the following factors as relevant to that consideration: (1) the giving of *Miranda* warnings, (2) the "'temporal proximity'" of the illegal entry and the alleged consent, (3) "'the presence of intervening circumstances,'" and (4) "'the purpose and flagrancy of the official misconduct.'" *Kaupp v. Texas,* 538 U.S. 626, 633, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003) (quoting *Brown v. Illinois,* 422 U.S. at 603–04, 95 S.Ct. 2254). Obviously, the first factor is most relevant where the person giving consent is in custody, which was not the case with Bean. Accordingly, we here focus on the remaining factors.

Snype's arrest was sought—armed robbery—qualifies as a crime of violence. The issuance of a warrant for Snype's arrest evidenced probable cause to believe he committed this crime. The circumstances of the shootout with the police provided a reasonable basis for believing Snype was armed. Those same circumstances established a likelihood that Snype would attempt to flee or use deadly force if alerted to the presence of arresting authorities. Further, the totality of these facts combine to excuse the lack of a "peaceful" entry.

This does not, however, permit us to ignore the remaining factor. Where authorities forcibly enter the home of a third party in search of a suspect, it will be a rare case in which exigency can support a warrantless entry without some showing of a reasonable belief that the person sought is inside the entered premises. This is not that rare case.

Only twenty minutes elapsed between the entry into Bean's apartment and her consent to search. Viewed in isolation, this might appear insufficient time to dissipate any taint from a forced entry. Nevertheless, as *Oguns* recognized, intervening events, even within a brief time, can sometimes sever the causal connection between an illegal entry and a subsequent consent to search, thereby permitting a court to conclude that the consent fairly reflects an act of free will. *See United States v. Oguns*, 921 F.2d at 447–48 (upholding consent to search given only minutes after an illegal entry); *see also Kaupp v. Texas*, 538 U.S. at 633, 123 S.Ct. 1843 (discussing need to show severance of causal connection). Like *Oguns*, this is such a case.

As earlier noted, before Bean's consent to search was sought, the entering SWAT team left her apartment, Snype was arrested and removed from the premises, Bean's own liberty was restored, and she was allowed to call her sister to come help with the care of her young child. Together, these intervening events effectively replaced the fearful atmosphere of the initial forcible entry with relative calm. *Cf. United States v. Mapp*, 476 F.2d at 78.[11] This complete change in circumstances explains Bean's perception of the entry as having occurred "way, way before" her consent to search. Hearing Tr. 23. Indeed, Bean testified that the officers who remained on the premises treated her "with respect" in explaining the situation leading to the entry and in seeking her consent to search. *Id.* at 18. Moreover, she stated that she then knew that she was not required to consent to any search. *See*

*United States v. Oguns*, 921 F.2d at 447 (considering defendant's awareness of Fourth Amendment right to refuse consent as a factor relevant to exercise of free will). In short, because the intervening circumstances successfully dissipated any taint from the initial entry, we can confidently conclude that Bean's consent represented an independent act of her free will.

Nor is the misconduct here at issue so flagrant as to warrant any different conclusion. Certainly, the purpose of the entry—to effect Snype's arrest for a violent robbery—was legitimate. Further, that purpose was supported by, at least, an arrest warrant. Moreover, while the forcible nature of the entry would be the fact of greatest concern to the validity of any subsequent consent, the use of such force found support in the circumstances detailed *supra* at 134 n. 10. Thus, any illegality in the entry derived not from its force but only from the lack of record support for a fact necessary to a *Payton* or exigency entry: the government's reasonable belief that Snype was in Bean's apartment at the time of the entry. Although we give the defendant the benefit of this omission in reviewing Bean's consent for taint, because the government's proffer suggests that there may well have been a basis for believing that Snype was present in the apartment, we will not label the presumed misconduct "flagrant."

In sum, even if we assume the illegality of the initial entry into Bean's apartment, we conclude that intervening events satisfactorily severed the connection between that entry and Bean's consent, permitting her to act entirely on her own free will.

---

**11.** Although *Mapp* noted the failure to restore calm in that case as a factor relevant to its conclusion that the ensuing consent to search was not voluntary, and although *Oguns* instructs that taint and voluntariness are separate inquiries, we recognize that the same facts can sometimes shed light on both issues.

3. *The Scope of Bean's Consent Encompassed the Seized Knapsack and Red Plastic Bag*

██ Snype submits that the district court erred in concluding that Bean could consent to the search of his belongings, specifically, a knapsack and red plastic bag. He is wrong.[12]

██ The law in this circuit is well settled that a third party's consent will validate a search of places or items in which another maintains a privacy interest if two conditions are satisfied: the third party had (1) " 'access to the area searched,' " and (2) either " '(a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access [to the area].' " *Ehrlich v. Town of Glastonbury*, 348 F.3d 48, 53 (2d Cir.2003) (quoting *United States v. Davis*, 967 F.2d 84, 87 (2d Cir.1992)). In this case, there is no question that Bean, as the lessor and resident of the apartment at issue, had the access and authority necessary to consent to a search of the entire premises. Thus, her open-ended consent would permit the search and seizure of any items found in the apartment with the exception of those "obviously" belonging to another person. *United States v. Zapata–Tamallo*, 833 F.2d 25, 27 (2d Cir.1987) (*per curiam*) (internal quotation marks omitted).

To the extent Snype attempts to fit himself within this exception, we note that it is not enough for him to offer on appeal the conclusory argument that law enforcement officers "had no objectively reasonable basis for concluding" that Bean had access to or any interest in the seized knapsack and red plastic bag. Appellant Br. 35. Rather, Snype was obliged to adduce credible evidence demonstrating that these items were obviously and exclusively his. *See United States v. Zapata–Tamallo*, 833 F.2d at 27. The burden is not easily satisfied. In *Zapata–Tamallo*, another case in which an apartment guest challenged the scope of his host's consent to search, an officer seized a blue duffel bag full of cocaine from under a bed. Although the same officer had earlier seen Zapata–Tamallo carry the blue bag into the apartment, this court ruled that the observed fact was insufficient to prove that the bag obviously and exclusively belonged to Zapata–Tamallo. *See id.* This conclusion compels the same result in this case. No officer ever saw Snype carrying the knapsack or red plastic bag. No marks on the bags linked them to him. To the extent the discovery of these items in the same room where Snype was arrested suggests a connection between him and the bags, such a possibility hardly equates to Snype's obvious, much less exclusive, ownership of the bags. The bedroom was, after all, full of personal belongings, ranging from children's toys to a laptop computer found inside a carrying case. Further, evidence of possible criminal conduct was also seized from elsewhere in the apartment—notably, rounds of ammunition in the living room. These circumstances, together with the fact that the robbery under investigation had been the object of a conspiracy among several persons, nec-

---

**12.** It is not clear whether Snype's challenge to the scope of consent extends also to the box full of money bundled in First Union Bank wrappers. No matter. The same conclusion would pertain to that item as to the knapsack and red plastic bag.

Because Bean's consent to the search was sought only after Snype was removed from the apartment pursuant to an arrest warrant, and because no evidence suggests that he was removed to avoid his opposition to a search, this case does not present the issue of conflicting responses presently pending before the Supreme Court in *Georgia v. Randolph*, 278 Ga. 614, 604 S.E.2d 835 (2004), *cert. granted*, 544 U.S. 973, 125 S.Ct. 1840, 161 L.Ed.2d 722 (2005) (addressing whether one occupant's consent to conduct warrantless

essarily raised the possibility that various persons in the apartment might share possessory interest in the items searched. Under these circumstances, we conclude that Snype has failed to demonstrate that any seized items so obviously belonged exclusively to him that the officers could not reasonably rely on Bean's unrestricted consent to search all items found in her home.

Accordingly, we identify no error in the district court's conclusion that Bean's voluntary consent supported a search of her entire apartment and all items found in it, including the seized knapsack and red plastic bag.

### C. *The Admission of Snype's Unredacted Marriage Certificate Does Not Warrant a New Trial*

Among the evidence offered by the government to prove the relationship between Snype and alleged co-conspirator Marisa Hicks was a New York State Department of Health certificate, dated September 30, 1994, authorizing the marriage of Vernon Snype and Marisa C. Hicks. In the space provided for the groom's street address, the license listed "Fishkill CF," a reference to the New York State Fishkill Correctional Facility where Snype was then incarcerated. In post-verdict conversations with defense counsel, certain unidentified jurors apparently revealed that, in the course of their deliberations, they had inferred from the Fishkill CF reference that Snype likely had a prior felony conviction. Accordingly, Snype now claims that he was denied his due process right to a fair trial, faulting the district court both for admitting the marriage certificate without redacting the Fishkill reference, and for denying his post-verdict motion for a

new trial based on this alleged error. These arguments are unconvincing.

1. *No Extrinsic Evidence of a Prior Conviction Was Considered by the Jury in this Case*

■ Preliminarily, we observe that Snype frames his due process challenge as one based on the jury's improper exposure to "extrinsic" information. *See United States v. Schwarz*, 283 F.3d 76, 97 (2d Cir.2002) (ordering new trial based on jury's exposure to "extrinsic information" in the form of press accounts of co-defendant's admissions at guilty plea); *United States v. Moten*, 582 F.2d 654, 664 (2d Cir.1978) (holding that defendant has constitutional right to be tried by impartial jury "unprejudiced by extraneous influence"). We reject this characterization. The jury that convicted Snype was not exposed to any information beyond that received in evidence at trial. Snype's real complaint is that the jury, upon reviewing a document in evidence, *i.e.,* his marriage certificate, drew an inference from his stated address that the parties had apparently not anticipated, *i.e.,* that he had a felony conviction.[13] This may raise a question about the propriety of receiving the marriage license into evidence without redaction, but it does not present us with a case of jury exposure to extrinsic information.

*Benjamin v. Fischer,* 248 F.Supp.2d 251 (S.D.N.Y.2002), *aff'd* 87 Fed.Appx. 761 (2d Cir.2004), relied on by Snype, is not to the contrary. In that *habeas corpus* case, a jury deliberately sought extrinsic information about a defendant's prior criminal record. That information was contained in a police report offered into evidence by the defense. Before submitting the exhibit to

---

search of residence is valid in face of another occupant's refusal).

**13.** At no time during trial did the prosecution highlight the Fishkill reference in the mar-

riage certificate or otherwise suggest to the jury that Snype had a prior criminal conviction.

the jury, however, counsel used a black marking pen to redact a portion relating his client's prior criminal record.[14] Because the redaction was poorly done, the deliberating jury was able to "place[ ] the police report up to the light, read through the black ink, and discover [the defendant's] prior robbery arrests." *Id.* at 257. The case is plainly distinguishable from Snype's. The *Benjamin* jurors had to have known from the black-ink redactions that certain material in the police report was not properly considered by them in their deliberations. Nevertheless, they went to considerable lengths to look behind the redaction to learn this extrinsic information. In short, the concern in *Benjamin* was not only jury exposure to extrinsic information, but possible jury misconduct. By contrast, in Snype's case, the jury never attempted to go behind any redacted evidence. At most, they drew an inference (of a prior conviction for an unspecified crime) from a fact (a Fishkill CF address) contained in an exhibit (a marriage certificate) that was submitted for their consideration without any indicia of redaction.

In these circumstances, Snype's marriage certificate challenge presents us with no due process issue about jury exposure to extrinsic information. Instead, we review only an evidentiary question about admitted evidence, specifically, whether the marriage certificate was properly received without redaction.

2. *The District Court Did Not Commit Plain Error in Failing Sua Sponte to Redact the Marriage Certificate*

 In the district court, Snype raised no objection to the marriage certificate's reference to Fishkill CF, nor did he seek any redaction of this information. Accordingly, we review the district court's failure *sua sponte* to redact this reference only for plain error. To demonstrate plain error, a defendant must show (1) error, (2) that is plain, and (3) that affects substantial rights. *See United States v. Vaval,* 404 F.3d 144, 151 (2d Cir.2005). Where these conditions are met, we have the discretion to notice a forfeited error if (4) it "'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (quoting *Johnson v. United States,* 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)); *see also* Fed. R.Crim.P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.").

 Applying this analysis to this case, we note that, even if we were to conclude that it was error not to redact the Fishkill reference from the marriage certificate before the document was submitted to the jury, we are loath to identify the error as "plain." *See Johnson v. United States,* 520 U.S. at 467, 117 S.Ct. 1544 (noting that an error is "plain" if the error is "clear under current law"); *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Snype points us to no rule of law—nor do we identify any—holding that, when a document in a criminal trial is offered in evidence without objection as to content, a trial judge must *sua sponte* review the exhibit to ensure that no fact contained therein—and no inference that could be drawn from any fact—is possibly

---

14. Among various curious circumstances in *Benjamin* is the fact that defense counsel undertook the redactions there at issue without consulting the trial court. *See Benjamin v. Fischer,* 248 F.Supp.2d at 253. We do not here suggest that any attorney can, by himself, decide to redact a portion of a document received in evidence. We observe only that, in this case, unlike in *Benjamin,* the document in evidence contained no redactions—however effected—for the jury to look behind.

prejudicial to the defendant. *See generally United States v. Campbell,* 223 F.3d 1286, 1288 (11th Cir.2000) *(per curiam)* (noting unwillingness "to say that a trial court's failure to sua sponte redact a defendant's [post-arrest] statement to remove [agent] hearsay is error"). Even if we were to rule otherwise, however, Snype's challenge would fail on the final two prongs of analysis because the charged redaction error was necessarily harmless in light of other overwhelming evidence of guilt. *See United States v. Singh,* 390 F.3d 168, 185 (2d Cir.2004) (rejecting plain error challenge "in light of the overwhelming evidence [of guilt] presented on behalf of the government").

 An evidentiary error not affecting substantial rights can be deemed harmless if we conclude with "fair assurance" that the jury's " 'judgment was not substantially swayed by the error.' " *O'Neal v. McAninch,* 513 U.S. 432, 437, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)); *accord United States v. Edwards,* 342 F.3d 168, 178–79 (2d Cir.2003) (collecting cases). Because this rule applies to the wrongful admission of prior crime evidence, *see United States v. Garcia,* 291 F.3d 127, 143 (2d Cir.2002); *United States v. Germosen,* 139 F.3d 120, 127 (2d Cir. 1998), it also reasonably applies to the wrongful admission of evidence from which a jury could infer prior criminal conduct. To conclude that a jury's judgment was not substantially swayed by an evidentiary error, we need not determine that the evidence "could not have had any effect whatever" on the jury. *United States v. Rea,* 958 F.2d 1206, 1220 (2d Cir.1992). Rather, we need decide only that the evidence at issue was " 'unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' " *Id.* (quoting *Yates v. Evatt,* 500 U.S. 391, 403, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991)). We easily reach that conclusion in this case.

Snype was implicated in the charged robbery conspiracy not only by the direct testimony of co-conspirator McCloud and the corroborating circumstantial web of telephone contacts among himself and other conspirators on the day of the robbery; he was caught red-handed in possession of almost the entirety of the robbery's cash proceeds (much of it still bundled in First Union Bank wrappers). Also in his possession was a teller's box taken at gunpoint in the robbery and likely tools of the crime, specifically, guns and ammunition.

Snype submits that this evidence does not overwhelmingly establish his role as one of the gunmen in the robbery, as the government argued at trial. That is beside the point. The law does not require the prosecution to prove that a defendant played any particular role in a conspiracy. It satisfactorily carries its burden on the participation element of conspiracy if it proves beyond a reasonable doubt that the defendant knew the general criminal purpose of the conspiracy and joined the scheme intending to help it succeed. *See United States v. Svoboda,* 347 F.3d at 477.

Because the totality of admissible evidence overwhelmingly proved Snype's participation in the charged conspiracy, as well as all other elements of that crime, we conclude that any error in submitting Snype's marriage certificate to the jury without redaction was clearly harmless. Accordingly, Snype is not entitled to reversal on the ground of plain error.

3. *The District Court Acted Within Its Discretion in Denying a New Trial*

 Snype asserts that, even if it was not plain error for the district court to admit the unredacted marriage certificate,

it was error to deny his motion to vacate based on post-verdict juror reports that they had inferred a prior conviction from the exhibit's reference to Fishkill. Rule 33(a) of the Federal Rules of Criminal Procedure states that a trial court "may vacate any judgment and grant a new trial if the interest of justice so requires." We review a district court's denial of a Rule 33 motion deferentially and will reverse only for abuse of discretion. *See United States v. Rivas,* 377 F.3d 195, 199 (2d Cir.2004). We identify no such abuse in this case.

■ As this court has explained, on a Rule 33 motion to vacate, "[t]he 'ultimate test' is 'whether letting a guilty verdict stand would be a manifest injustice.'" *United States v. Canova,* 412 F.3d 331, 349 (2d Cir.2005) (quoting *United States v. Ferguson,* 246 F.3d 129, 133 (2d Cir.2001)). In other words, "[t]here must be a real concern that an innocent person may have been convicted." *Id.* (internal quotation marks omitted). This case presents no such concern.

■ As noted in the immediately preceding section of this opinion, the evidence of Snype's guilt on the charge of conspiracy—the only charge on which he was convicted—was overwhelming without regard to any inference of a prior conviction that might be drawn from the unredacted marriage certificate. Further, because we conclude that such an inference does not constitute extrinsic evidence, we reject Snype's argument that the district court was obliged to examine the jurors further before ruling on his motion to vacate. Courts generally may not question jurors concerning any matter relating to jury deliberations other than the potential exposure of jury members to "extraneous prejudicial information." Fed.R.Evid. 606(b); *see also United States v. Thomas,* 116 F.3d 606, 618 (2d Cir.1997) (emphasizing that "[t]he secrecy of deliberations is the cornerstone of the modern Anglo–American jury system"); *United States v. DiSalvo,* 34 F.3d 1204, 1225 (3rd Cir.1994) (precluding post-verdict inquiry of jury into inferences drawn from certain evidence). Indeed, courts go to great lengths to avoid post-verdict inquiries by the parties to the litigation, or even by third parties, into the substance of jury deliberations. *See United States v. Thomas,* 116 F.3d at 619–20 (discussing prophylactic measures that judges take, including advising jurors against divulging the substance of their deliberations, "imposing strict limitations on what jurors are permitted to disclose," and "subject[ing] post-verdict juror interviews to judicial supervision.").[15]

In sum, because the jury was not exposed to extrinsic evidence, we conclude that the district court acted within its discretion in denying Snype's Rule 33 motion to vacate.

### D. *The District Court Properly Denied Snype's Request to Charge Accessory After the Fact*

■ At the close of the evidence, Snype requested that the district court charge the jury on an unindicted crime: accessory after the fact. *See* 18 U.S.C. § 3. He submits that the court's denial of this request violated his due process right to a fair trial by preventing him from presenting a defense.

---

**15.** Even when a jury has been exposed to extrinsic evidence, a trial court's task is not to inquire into the jurors' subjective views of the effect of that exposure on their deliberations. Instead, it employs a "hypothetical average juror" to make an objective assessment of the likely prejudicial effect of the extrinsic evidence. *See Manley v. AmBase Corp.,* 337 F.3d 237, 252 (2d Cir.2003); *United States v. Schwarz,* 283 F.3d at 99.

 This constitutional argument merits little discussion. A criminal defendant "has no constitutional right" to be prosecuted under any particular statute. *United States v. Batchelder,* 442 U.S. 114, 125, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979) (rejecting argument that, where conduct conceivably violated two statutes, defendant had right to be charged under the one providing for lesser penalties). In a government of divided powers, "[w]hether to prosecute and what charge to file or bring before a grand jury" are decisions that generally rest in the sole discretion of the executive branch. *Id.* at 124, 99 S.Ct. 2198 (collecting cases); *see also United States v. Armstrong,* 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (collecting cases). Certainly, the Constitution precludes the executive from employing "an unjustifiable standard such as race, religion, or other arbitrary classification" in the exercise of its prosecutorial discretion. *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962); *accord United States v. Armstrong,* 517 U.S. at 464, 116 S.Ct. 1480. But the remedy in such cases is dismissal of charges improperly filed. The judiciary cannot compel the executive to file particular charges against a defendant. *See generally United States v. Armstrong,* 517 U.S. at 465, 116 S.Ct. 1480 (questioning court's competence to assess factors that necessarily inform prosecutor's charging decisions, for example, " 'the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan' " (quoting *Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985))). Thus, even though Snype submits on appeal that he would have been willing to waive his right to a grand jury indictment to secure the requested accessory instruction, the district court could not have submitted a § 3 count to the jury unless the United States Attorney agreed to file a felony information charging a violation of that statute. *See* Fed.R.Crim.P. 7(b).

*United States v. Ferguson,* 758 F.2d 843 (2d Cir.1985), cited by Snype, does not hold otherwise. In that case, we ruled only that defendants who persuaded a district court to charge accessory after the fact to bank robbery, despite "informed opposition" by the government, *id.* at 851, could not thereafter raise appellate challenges to their accessory convictions on the grounds that the crime was not a lesser included offense of robbery and that they had failed adequately to waive their right to indictment, *see id.* at 852 ("Having obtained from the court precisely what they affirmatively sought, it ill behooves defendants now to complain that their waiver of indictment to the offense lacked the formality stated in Fed.R.Crim.P. 7."). Nothing in *Ferguson* suggests a constitutional right to an accessory charge in a robbery case.

 We recognize, of course, that the Federal Rules of Criminal Procedure do afford a defendant the right to have a lesser included offense charged to a jury. *See* Fed.R.Crim.P. 31(c) ("A defendant may be found guilty of ... (1) an offense necessarily included in the offense charged"). The Supreme Court has adopted an elements approach to Rule 31(c). *See Schmuck v. United States,* 489 U.S. 705, 716, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). Thus, "a defendant is entitled to a lesser-included offense instruction under federal law *only* if (1) the elements of the lesser offense are a subset of the elements of the charged offense, and (2) the evidence at trial permits a rational jury to find the defendant guilty of the lesser offense and acquit him of the greater." *United States v. Diaz,* 176 F.3d 52, 101 (2d Cir.1999) (emphasis added) (internal quo-

tation marks and citations omitted). Snype cannot complain of any Rule 31(c) error because the elements of accessory after the fact are not a subset of the elements of any of the charged crimes.

 The elements of a § 371 conspiracy are clearly established: (1) an agreement between two or more persons to commit a specified federal offense, (2) the defendant's knowing and willful joinder in that common agreement, and (3) some conspirator's commission of an overt act in furtherance of the agreement. *See, e.g., United States v. Svoboda,* 347 F.3d at 476; *see also* Leonard B. Sand, *et al.,* 1 *Modern Federal Jury Instructions: Criminal,* Instruction 19–3 (2003). The elements of accessory after the fact under 18 U.S.C. § 3 are (1) commission of a specified offense by some person, (2) the defendant's knowledge of the crime's commission and the principal's participation in it, and (3) the defendant's assistance to the principal "with the specific purpose or plan to hinder or prevent" the principal's "apprehension, trial, or punishment." Leonard B. Sand, *et al.,* 1 *Modern Federal Jury Instructions: Criminal,* Instruction 12–2 (2002). As this recitation demonstrates, a defendant need not join in a robbery conspiracy to be guilty as an accessory to that crime. But an accessory's guilt does depend on proof of an element separate and distinct from those required to convict for conspiracy, specifically, the accessory's after-the-fact assistance to a member of the conspiracy with the specific purpose to hinder or prevent that person's apprehension, trial, or punishment.[16]

Accordingly, because we conclude that neither the Constitution nor Rule 31(c) required the district court to give an accessory instruction to the jury in this case, we reject Snype's challenge to the charge as without merit.

### E. Snype's Challenges to His Sentence Are Without Merit

#### 1. The Application of § 3559(c)(1) to Snype's Case

Although a § 371 conspiracy conviction generally exposes a defendant to a maximum prison term of five years, *see* 18 U.S.C. § 371, Snype was sentenced to a mandatory term of life imprisonment pursuant to 18 U.S.C. § 3559(c)(1).

Section 3559(c)(1) states in relevant part:

> Notwithstanding any other provision of law, a person who is convicted in a court of the United States of a serious violent felony shall be sentenced to life imprisonment if—
>
> > (A) the person has been convicted (and those convictions have become final) on separate prior occasions in a court of the United States or of a State of—
> >
> > > (i) 2 or more serious violent felonies . . . .[17]

As this language indicates, the statutory mandate is triggered by proof of two facts:

---

**16.** Indeed, this accessory element is separate and distinct from those required to prove simple or aggravated robbery, counts on which no verdict was returned in Snype's case. *See* Leonard B. Sand, *et al.,* 3 *Modern Federal Jury Instructions: Criminal,* Instruction 53–2 (defining elements of 18 U.S.C. § 2113(a)); *id.,* Instruction 53–9 (defining elements of 18 U.S.C. § 2113(d)).

**17.** Section 3559(c) does not specifically define "convicted," a term that "can mean either the finding of guilt or the entry of a final judgment on the merits." *Deal v. United States,* 508 U.S. 129, 131, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993). Nevertheless, because the statute first employs "convicted" to refer to the person standing before the court for sentence, we can easily conclude that the term there alludes simply to a guilt determination.

In subpart (1)(A), however, Congress employs additional language to clarify its intent for an inquiry into more than guilt determina-

(1) the crime for which a defendant is about to be sentenced must itself be a "serious violent felony," and (2) the defendant must, on at least two separate prior occasions, have been convicted of serious violent felonies. It is this combination of past and present serious violent felony convictions that earns the statute its "three-strikes" appellation.

For purposes of § 3559(c)(1), "serious violent felony" is defined to mean:

(i) a Federal or State offense, by whatever designation and wherever committed, consisting of murder (as described in section 1111); manslaughter other than involuntary manslaughter (as de-

scribed in section 1112); assault with intent to commit murder (as described in section 113(a)); assault with intent to commit rape; aggravated sexual abuse and sexual abuse (as described in sections 2241 and 2242); abusive sexual contact (as described in sections 2244(a)(1) and (a)(2)); kidnapping; aircraft piracy (as described in section 46502 of Title 49); *robbery (as described in section 2111, 2113, or 2118 )* [18]; carjacking (as described in section 2119); extortion; arson; firearms use; firearms possession (as described in section 924(c)); *or attempt, conspiracy, or solicitation to commit any of the above offenses;* and

tions when assessing a defendant's prior convictions. It there specifies that the defendant must have "been convicted (*and those convictions have become final* ) on separate prior occasions ... of—(i) 2 or more serious violent felonies." 18 U.S.C. § 3559(c)(1)(A) (emphasis added). Depending on the statutory context, a conviction might be deemed final at various times, for example, on the date judgment was imposed or on the date an appellate mandate issued. *See Clay v. United States,* 537 U.S. 522, 527, 123 S.Ct. 1072, 155 L.Ed.2d 88 (2003) (recognizing alternative views of "finality"). Whichever view of finality applies to § 3559(c)(1), there can be no doubt that Snype's prior state convictions here at issue, *see infra* at 144, were each entered on separate occasions prior to Snype's federal crime and fairly represent separate convictions. *See United States v. Powell,* 404 F.3d 678, 682 (2d Cir.2005) (holding that, for purposes of imposing a mandatory life sentence under 21 U.S.C. § 841(b)(1)(A), two prior drug convictions should be viewed as separate from one another unless "the conduct underlying both convictions was part of a 'single criminal episode'" (quoting *United States v. Gray,* 152 F.3d 816, 821 (8th Cir.1998))); *see also United States v. Martino,* 294 F.3d 346, 351 & n. * (2d Cir.2002) (holding that prior final conviction is separate from conviction on which defendant faces sentencing if "defendant had a meaningful opportunity to refrain from criminal activity and instead engaged in criminality anew").

In the district court, Snype argued that the "separate prior occasions" language of § 3559(c)(1)(A) permits successive convictions to be considered only if each reflects criminal conduct occurring *after* formal entry of a preceding final judgment. Like the district court, we are skeptical that this view accurately reflects Congress's intent in enacting § 3559(c). We need not resolve the issue in this case, however, because the record makes clear that two of Snype's prior state convictions—in 1981 for attempted first degree robbery and in 1983 for first degree robbery—fit even his proposed construction of the statute.

**18.** These statutes proscribe, *inter alia,* robberies (1) occurring within the special maritime and territorial jurisdiction of the United States, *see* 18 U.S.C. § 2111; (2) of federally accredited or insured banks, credit unions, or savings and loan associations, *see id.* § 2113; and (3) of controlled substances belonging to certain persons registered with the Drug Enforcement Administration, *see id.* § 2118. All three statutes define robbery as the use of "force ... violence, or ... intimidation," to "take[ ], or attempt to take," from another person a thing of value. *See id.* §§ 2111, 2113(a), 2118(a). The latter two statutes also proscribe specified aggravated conduct involving the use of a dangerous weapon or the killing of any person in connection with the robbery. *See id.* §§ 2113(d) & (e), 2118(c)(1) & (2).

(ii) any other offense punishable by a maximum term of imprisonment of 10 years or more that has as an element the use, attempted use, or threatened use of physical force against the person of another or that, by its nature, involves a substantial risk that physical force against the person of another may be used in the course of committing the offense.

18 U.S.C. § 3559(c)(2)(F) (emphasis added) (footnote added). On this appeal, we focus on subpart (i).

■ Because the jury in this case found Snype guilty beyond a reasonable doubt of conspiring to commit robbery in violation of § 2113, his instant crime plainly falls within the definition of serious violent felony articulated in § 3559(c)(2)(F)(i). Although Snype does not seriously dispute that conclusion, he notes that the jury did not make a specific finding as between the dual charged purposes of the conspiracy count of conviction, i.e., simple bank robbery in violation of § 2113(a) and aggravated bank robbery in violation of § 2113(d). The distinction is irrelevant to the statutory definition of a serious violent felony. Even if we were to assume arguendo that the jury found Snype guilty only of a conspiracy to violate § 2113(a), the plain language of § 3559(c)(2)(F)(i) identifies any robbery in violation of § 2113, or an inchoate version of such a robbery—namely, attempt, conspiracy, or solicitation to commit the offense—as a serious violent felony. See generally Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (noting that statutory construction begins and ends with language of the statute if language is unambiguous and statu-

tory scheme is coherent); accord Virgilio v. City of New York, 407 F.3d 105, 112 (2d Cir.2005).

■ As for prior convictions, the government relied on Snype's three prior New York State robbery convictions to satisfy the second requirement of § 3559(c)(1): (1) a 1980 conviction for attempted second degree robbery, see N.Y. Penal Law §§ 110.00, 160.10; (2) a 1981 conviction for attempted first degree robbery, see id. §§ 110.00, 160.15; and (3) a 1983 conviction for two counts of first degree robbery, see id. § 160.15.[19] Under New York law, "[r]obbery is forcible stealing," committed when a person "uses or threatens the immediate use of physical force" to take property belonging to another. Id. § 160.00; see also id. § 155.05 (defining larceny). Because these state statutory elements parallel those required to establish robbery under 18 U.S.C. §§ 2111, 2113(a), and 2118(a), there can be no question that New York State convictions for first and second degree robbery by definition qualify as serious violent felonies under § 3559(c)(2)(F)(i). See, e.g., Leonard B. Sand, et al., 3 Modern Federal Jury Instructions: Criminal, Instruction 53–2 (defining robbery in context of § 2113); see also Criminal Jury Instructions (New York), Second Edition, PL 160.00, at 160–1002 (defining robbery).

In urging a different conclusion, Snype argues that § 3559(c)(2)(F)(i) does not, by itself, define "serious violent felony." He submits that this section must be read in conjunction with § 3559(c)(3). He misconstrues the statute. Section 3559(c)(3) does not define what constitutes a serious violent felony. Rather, it serves, in effect, as a safety valve, affording defendants con-

---

**19.** Snype was sentenced on December 19, 1980, to a zero-to-four year term of incarceration for attempted second degree robbery; on February 3, 1981, to a two-to-six year term for attempted first degree robbery; and on September 23, 1983, to a term of ten years to life on two counts of first degree robbery.

victed of certain serious violent felonies an opportunity to avoid the statutorily mandated life sentence on a clear and convincing showing of circumstances mitigating their commission of any such violent felony. If a defendant makes the required showing, that particular serious violent felony will no longer qualify for consideration in determining the applicability of the § 3559(c)(1) mandate. Thus, with respect to robbery convictions, § 3559(c)(3) states:

> Robbery, [or] an attempt, conspiracy, or solicitation to commit robbery ... shall not serve as a basis for sentencing under this subsection if the defendant establishes by clear and convincing evidence that—
>
> (i) no firearm or other dangerous weapon was used in the offense and no threat of use of a firearm or other dangerous weapon was involved in the offense, and
>
> (ii) the offense did not result in death or serious bodily injury (as defined in section 1365) to any person.

18 U.S.C. § 3559(c)(3)(A).

Having thus outlined the statutory scheme, we turn to Snype's four particular challenges to his life sentence. First, Snype submits that he, in fact, carried the burden imposed by § 3559(c)(3)(A) and that the district court erred in concluding otherwise. Second, Snype argues that, under the Sixth Amendment, as construed in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the district court erred in itself making factual findings relevant to the application of a life sentence under § 3559(c)(1), rather than submitting those issues to the jury. Third,

despite the clear language of § 3559(c)(3)(A) assigning the burden of proof to the defendant, Snype asserts that due process required the government to prove that his present federal and prior state robbery convictions do not fall within the § 3559(c)(3)(A) exception. Finally, Snype contends that even if we reject each of these sentencing challenges, a term of life incarceration constitutes cruel and unusual punishment in his case. We reject these arguments on the merits.

### 2. *Snype Did Not Carry the Burden Imposed by § 3559(c)(3)(A)*

■ If, as Snype contends, he did make the clear and convincing showing required by § 3559(c)(3)(A), that could obviate the need for us to address his various constitutional challenges to sentence. In fact, he did not carry this burden. In reaching this conclusion, we review a district court's findings of fact as they pertain to sentence only for clear error, *see United States v. Ayers*, 416 F.3d 131, 133 (2d Cir.2005), and we find none in this case.

Focusing first on the robbery conspiracy charge for which he was found guilty, Snype argues that this crime necessarily falls within the exception created by § 3559(c)(3)(A) because "the only logical inference" to be drawn from the jury's failure to convict him on the substantive weapons and aggravated robbery counts is that he participated in the conspiracy in some manner other than through the use of weapons. *See* 18 U.S.C. § 3559(c)(3)(A)(i).[20] The argument is flawed in at least two respects. First, a

---

**20.** Snype argues that there is no § 3559(c)(3)(A)(ii) issue with respect to his robbery conspiracy conviction because co-conspirator Partlow's death at the hands of apprehending law enforcement officers "did not result" from the conspiracy offense. Because the government does not contend other-

wise, we have no occasion to consider that question on this appeal. We note that Snype's ability to satisfy § 3559(c)(3)(A)(ii) is also not at issue with respect to his prior state robbery convictions. Thus, we focus in this section only on Snype's satisfaction of § 3559(c)(3)(A)(i).

jury's failure to return a verdict tells us nothing about its view of the evidence other than that the jurors were not unanimously convinced beyond a reasonable doubt that the prosecution had proved each of the elements of the crimes under consideration. *See generally United States v. Newton,* 369 F.3d at 680 (noting that "[a] jury may hang for any number of reasons, including the idiosyncratic views of a single juror"). This hardly constitutes "clear and convincing" proof that the defendant did not use or threaten the use of a firearm or other dangerous weapon in the course of the robbery crime of conviction. Second, the pertinent inquiry under § 3559(c)(3)(A) is not whether Snype can convincingly show that *he* never used or threatened to use a firearm in the course of the robbery conspiracy; it is whether he can show that *no participant* in the conspiracy used or threatened the use of a firearm. The record plainly will not support such a finding.

At least five eyewitnesses provided direct testimony that firearms were used in furtherance of the bank robbery conspiracy. First, a parking attendant testified that, at approximately 8:00 a.m. on the morning of the robbery, William Partlow— undisputedly one of the robbers—acting together with another unidentified man, brandished a firearm to steal the SUV that would be used as the robbery getaway car, a charged overt act in furtherance of the conspiracy. Second, a customer in the bank at the time of the robbery vividly recounted how one of two masked robbers grabbed his wife, pushed her to the ground, pointed a pistol at her, and ordered him to "Get down [by your wife] or I'll shoot you." Trial Tr. 34. Third, a bank manager confirmed the customer's account and reported that, in fact, both robbers had guns drawn during the robbery. Fourth, a teller testified to seeing one of the masked robbers point a gun at each of his fellow tellers and demand money. According to the teller, this robber then "pointed the gun right at my head" and ordered him to open the cash vault. *Id.* at 285–86. Fifth, a police officer chasing the robbers as they left in the stolen SUV testified that a man "fired about four to five shots" at the police from out the SUV's passenger window. *Id.* at 181.

On this compelling evidence, whatever the burden of proof and by whomever borne, it is inconceivable that any court could make the requisite § 3559(c)(3)(A) finding that "no firearm" was used in the course of the charged robbery conspiracy.[21]

As for Snype's prior state robbery convictions, he submits that he carried his

---

21. In light of this conclusion, we need not address Snype's contention that the imposition of a clear and convincing, as opposed to preponderance, burden of proof to satisfy § 3559(c)(3)(A) violates due process. We note only that *Cooper v. Oklahoma,* 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996), cited by Snype, does not support this argument. In *Cooper,* the Supreme Court ruled unconstitutional a state statute that presumed a defendant's competency to stand trial unless the defendant proved incompetence by clear and convincing evidence. *See id.* at 363, 369, 116 S.Ct. 1373. As *Cooper* recognized, *see id.* at 367–68, 116 S.Ct. 1373, there is a significant distinction between the burden of proof that may fairly be assigned to a defendant with respect to a fundamental right, such as the right there at issue not to be forced to stand trial while incompetent, and the burden that may be assigned with respect to a statutory privilege that Congress is under no obligation to afford, such as a privilege to avoid an enhanced sentence on a showing of specified mitigating circumstances. *See id.; see also United States v. Bradshaw,* 281 F.3d 278, 296 (1st Cir.2002) (noting distinction in rejecting *Cooper* challenge to clear and convincing proof burden in § 3559(c)(3)(A)); *United States v. Gatewood,* 230 F.3d 186, 190–91 (6th Cir.2000) (*en banc* ) (same).

§ 3559(c)(3)(A) burden by pointing to his plea allocutions for these crimes, which admit only that he or his confederates carried firearms during these robberies, not that they ever used the weapons in the course thereof. *See generally Bailey v. United States,* 516 U.S. 137, 146, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) (drawing distinction between use and carrying of firearm for purposes of 18 U.S.C. § 924(c)(1)). In the district court, Snype appears to have raised no objection to the sentencing judge's observation that the use or threatened use of a dangerous instrument was a necessary element of first degree robbery, the serious violent felony at issue in his 1981 and 1983 convictions. *See* N.Y. Penal Law § 160.15(3). Only on appeal does he note that first degree robbery can also be committed by a person "armed with a deadly weapon." *Id.* § 160.15(2). The point is of no significance. The fact that Snype did not specifically allocute to use of the firearms that he and his confederates carried in the course of the state robberies at issue hardly constitutes "clear and convincing" evidence that firearms were not deployed in these crimes. In state court proceedings, the prosecution proffered that Snype had brandished a firearm in both the 1981 and 1983 robberies. Indeed, it represented that in fleeing from the 1983 robbery, Snype had fired a shot at a pursuing customer. Whatever categorical limits might apply to the prosecution in proving that a prior conviction triggers a statutory sentencing enhancement, *see Shepard v. United States,* 544 U.S. 13, 16, 125 S.Ct. 1254, 1257, 161 L.Ed.2d 205 (2005) (holding that court could look only to "the statutory definition" of a crime, the "charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented" in determining if prior conviction qualified as a "generic burglary" for purposes of en-

hanced sentencing under Armed Career Criminal Act), no similar limitations apply to a defendant seeking the benefit of § 3559(c)(3)(A). The relief afforded by that statute does not depend on the elements of the robbery crimes constituting serious violent felonies, nor on the pleadings or allocution. Rather, relief depends on a clear and convincing showing that the circumstances of the crime did not involve the egregious actions or consequences specified in the statute. In this case, we cannot conclude that the district court clearly erred in ruling that Snype's taciturn plea allocutions did not clearly and convincingly make the showing required by § 3559(c)(3)(A)(i).

Accordingly, we reject Snype's argument that he satisfactorily established his entitlement to § 3559(c)(3)(A) relief.

3. *Judicial Factfinding Under § 3559(c)(1) Does Not Violate the Sixth Amendment as Construed in Apprendi v. New Jersey*

In *Apprendi v. New Jersey,* the Supreme Court ruled that " '[i]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.' " *United States v. Gonzalez,* 420 F.3d 111, 123 (2d Cir.2005) (quoting *Apprendi v. New Jersey,* 530 U.S. at 490, 120 S.Ct. 2348) (internal quotation marks and citations omitted); *see also United States v. Holguin,* 436 F.3d 111, 117 (2d Cir.2006) (noting that *Apprendi* construed Sixth Amendment to require "that facts supporting a sentence must be found by a jury when they are either (1) a condition of guilt of the crime, or (2) permit a higher maximum sentence to be imposed"). Relying on this rule, Snype submits that the Sixth Amendment required the prosecution to prove beyond a reasonable doubt to a jury both the fact of

his prior convictions and their status as serious violent felonies for purposes of § 3559(c)(1). We disagree with both arguments.

■ Preliminarily, we recognize that § 3559(c)(1) mandates a significant increase in Snype's sentencing range that, after *Apprendi*, might appear to warrant treating any facts supporting application of the statute as elements of a new offense requiring proof to a jury. In *Apprendi* itself, however, the Supreme Court created a specific exception to this rule for "the fact of a prior conviction." *Apprendi v. New Jersey*, 530 U.S. at 490, 120 S.Ct. 2348. This exception preserved the holding in *Almendarez–Torres v. United States*, 523 U.S. 224, 239–47, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), which stated that, where a statute provides for an enhanced penalty based on a defendant's prior convictions, the fact of those convictions is a sentencing factor to be determined by the court rather than a jury. Although the continued viability of *Almendarez–Torres* has been questioned, *see Shepard v. United States*, 544 U.S. at 27–28, 125 S.Ct. at 1264 (Thomas, J., concurring in part and concurring in judgment) (suggesting that a majority of the Supreme Court now views *Almendarez–Torres* as inconsistent with *Apprendi* ), the Supreme Court has not reversed its holding, *see generally United States v. Booker*, 543 U.S. 220, 244, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) (reaffirming *Apprendi* rule in terms including *Almendarez–Torres* exception: "Any fact (*other than a prior conviction* ) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt" (emphasis added)); *cf. Dretke v. Haley*, 541 U.S. 386, 395, 124 S.Ct. 1847, 158 L.Ed.2d 659 (2004) ("We have not

extended [*In re* ] *Winship* 's protections to proof of prior convictions used to support recidivist enhancements."). Thus, *Almendarez–Torres* continues to bind this court in its application of *Apprendi*. *See United States v. Estrada*, 428 F.3d 387, 390 (2d Cir.2005) (applying *Almendarez–Torres* exception post-*Booker* ); *United States v. Santiago*, 268 F.3d 151, 155 (2d Cir.2001). With this understanding of the law, we identify no Sixth Amendment error in the district court's findings as to the fact of Snype's prior state robbery convictions. Four of our sister circuits have considered this question and reached the same conclusion. *See United States v. Cooper*, 375 F.3d 1041, 1053 n. 3 (10th Cir.2004) (rejecting *Apprendi* challenge to judicial factfinding with respect to prior convictions triggering enhanced sentence under § 3559(c)(1)); *United States v. Bradshaw*, 281 F.3d 278, 294 (1st Cir.2002) (same); *United States v. Weaver*, 267 F.3d 231, 251 (3d Cir.2001) (same); *United States v. Davis*, 260 F.3d 965, 969 (8th Cir.2001) (same).

■ To the extent Snype contends that, nevertheless, a jury had to find that his present and past robbery convictions qualified as serious violent felonies, his argument is similarly unconvincing for the simple reason that, in this case, the district court did not need to look beyond the judicial record and the statutory definitions of the crimes of conviction to find that Snype's convictions fit the definition of serious violent felony stated in § 3559(c)(2)(F)(i). *See Shepard v. United States*, 544 S.Ct. at 24, 125 S.Ct. at 1262 (plurality opinion) (holding that no Sixth Amendment concern arises when fact relating to prior conviction can be ascertained from judicial record and statutory definition). As we have already discussed, in the case of the federal robbery conspiracy crime, the jury specifically found Snype

guilty beyond a reasonable doubt of conspiring to violate § 2113, bringing that conviction within the plain language of § 3559(c)(2)(F)'s definition of serious violent felony. As for Snype's state robbery convictions, the state law definitions of the first and second degree robbery crimes referenced in the judgments of conviction plainly comport with the common definition of robbery in §§ 2111, 2113, and 2118, thereby bringing those state convictions within § 3559(c)(2)(F)(i). *See supra* at 144.

Insofar as § 3559(c)(3)(A) afforded Snype an opportunity to avoid imposition of a lifetime sentence on a clear and convincing showing of specified circumstances, we conclude that no Sixth Amendment concern arises because, as previously observed, § 3559(c)(3)(A) can be analogized to a safety valve or an affirmative defense, which is properly considered only after a court determines that the defendant's present and past convictions constitute serious violent felonies under § 3559(c)(2)(F)(i), thereby triggering the sentencing mandate of § 3559(c)(1). *See generally Patterson v. New York*, 432 U.S. 197, 205–06, 209, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) (recognizing Congress's power to place burden of proving affirmative defense on defendant as long as state proves all elements of the crime beyond a reasonable doubt); *United States v. Holguin*, 436 F.3d at 117 (rejecting argument that eligibility criteria for sentence reduction constitute elements that must be disproved by government to sentence defendant within otherwise applicable increased sentencing range). We discuss this point further in the next section of this opinion, which addresses Snype's claim that § 3559(c)(3)(A) violates due process by placing its burden of proof on the defendant.

Because we reject that claim on the merits, and for the other reasons here discussed, we hold that the district court's factfinding in connection with Snype's § 3559(c)(1) sentence did not violate the Sixth Amendment rule as interpreted by *Apprendi*.

4. *Section 3559(c)(3)(A) Does Not Violate Due Process by Placing the Burden of Proof on the Defendant*

■ In a variation on his *Apprendi* argument, Snype asserts that due process, as well as the Sixth Amendment, requires the government to prove the aggravating robbery factors detailed in § 3559(c)(3)(A). He submits that this section is unconstitutional to the extent it shifts this burden of proof to the defense. A similar argument has been presented to our sister circuits, which have uniformly concluded, both before and after *Apprendi*, that § 3559(c)(3)(A)'s assigned burden of proof does not offend due process. *See, e.g., United States v. Williams*, 308 F.3d 833, 840 (8th Cir.2002); *United States v. Bradshaw*, 281 F.3d at 295 [1st Cir.]; *United States v. Brown*, 276 F.3d 930, 932 (7th Cir.2002); *United States v. Gray*, 260 F.3d 1267, 1278–79 (11th Cir.2001); *United States v. Gatewood*, 230 F.3d at 190–91 [6th Cir.]; *United States v. Ferguson*, 211 F.3d 878, 887 (5th Cir.2000); *United States v. Smith*, 208 F.3d 1187, 1190 (10th Cir. 2000); *United States v. Kaluna*, 192 F.3d 1188, 1196 (9th Cir.1999) (*en banc*). We now join in that conclusion.

Like our sister circuits, we identify *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281, as instructive in considering a due process challenge to the assignment of a defense burden in § 3559(c)(3)(A). At issue in *Patterson* was a New York State statute permitting a defendant to raise an affirmative defense mitigating murder to manslaughter on a preponderance showing of "extreme emotional disturbance." 432 U.S. at 198–99, 97 S.Ct. 2319. In considering a due process

challenge to the assignment of that burden of proof, the Supreme Court recognized that the sovereign power to criminalize conduct and to prescribe punishment logically includes the power to identify factors that mitigate criminality or punishment. *See id.* at 209, 97 S.Ct. 2319; *see also United States v. Bradshaw*, 281 F.3d at 295. The Court expressly rejected, however, the argument that the Constitution necessarily requires the prosecution to disprove any such mitigating factors. It observed that nothing in *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), altered the "long-accepted rule ... that it was constitutionally permissible to provide that various affirmative defenses were to be proved by the defendant." *Patterson v. New York*, 432 U.S. at 211, 97 S.Ct. 2319; *see also United States v. Brown*, 276 F.3d at 932 (citing cases indicating that sovereign may even assign heightened burden of proof to affirmative defense). What the Constitution does proscribe are presumptive findings of guilt: "The legislature cannot 'validly command that the finding of an indictment, or mere proof of the identity of the accused, should create a presumption of the existence of all the facts essential to guilt.' " *Patterson v. New York*, 432 U.S. at 210, 97 S.Ct. 2319 (quoting *Tot v. United States*, 319 U.S. 463, 469, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943)). Thus, *Patterson* instructs that, as long as the prosecution proves the elements of a charged crime beyond a reasonable doubt, the state is entitled to "assure itself that [a specified mitigating fact] has been established with reasonable certainty," by placing the burden of proof as to that fact on the defendant. *Id.* at 209, 97 S.Ct. 2319; *see also United States v. Johnson*, 968 F.2d 208, 213–14 (2d Cir.1992) (observing that "an affirmative defense may not, in operation, negate an element of the crime which the government is required to prove; otherwise, there would be

too great a risk that a jury, by placing undue emphasis on the affirmative defense, might presume that the government had already met its burden of proof").

Because the sentencing process, even after *Apprendi*, is "no more exacting than the process of establishing guilt," *Patterson*'s reasoning applies with full force to Snype's challenge to the burden of proof assignment in § 3559(c)(3)(A). *United States v. Bradshaw*, 281 F.3d at 295 (relying on *Patterson* in holding that "a paradigm that allows the defendant to raise an affirmative defense during the sentencing phase of criminal proceedings, but then shifts the burden of proof to him to establish the defense, does not violate due process"); *see also United States v. Brown*, 276 F.3d at 932 (holding that "*Apprendi* leaves undisturbed the principle that while the prosecution must indeed prove all the elements of the offense charged beyond a reasonable doubt, the legislation creating the offense can place the burden of proving affirmative defenses on the defendant" (internal citations omitted)); *United States v. Wicks*, 132 F.3d 383, 389 (7th Cir.1997) ("If *Patterson* allows such a result even at the stage of the trial where guilt or innocence is decided, it follows that due process does not prohibit the kind of affirmative defense at the sentencing stage found in § 3559(c)(3)(A).").

Applying that reasoning to this case, we conclude that § 3559(c)(1) creates no constitutionally impermissible presumption that any indicted federal defendant should receive a mandatory term of life imprisonment. To trigger that mandate, the government must first prove to a jury beyond a reasonable doubt all elements of the crime charged in the indictment, in this case, conspiracy to commit bank robbery in violation of 18 U.S.C. §§ 371, 2113. If, as occurred here, the jury finds that burden of proof carried, the government must

then prove to the satisfaction of the sentencing court that the federal crime of conviction by definition constitutes a serious violent felony as defined in § 3559(c)(2)(F). Further, it must prove to the sentencing court that, on two or more separate prior occasions, the defendant was convicted of crimes that also, by definition, constitute serious violent felonies under § 3559(c)(2)(F). Only because the government fully carried these burdens was the § 3559(c)(1) mandate applicable to Snype's case. *See United States v. Brown*, 276 F.3d at 933 (observing that federal "three strikes" law "does not involve erosion of the principle that all elements of the offense must be proved beyond a reasonable doubt"). In these circumstances, there was no due process violation in affording Snype an opportunity to avoid a life sentence on his clear and convincing showing of the facts specified in § 3559(c)(3)(A).

In urging otherwise, Snype asserts that § 3559(c), read as a whole, reflects Congress's intent to impose life sentences in cases only of aggravated robberies. He submits that the statute creates an impermissible presumption that all robbery convictions are for aggravated robberies unless a defendant proves otherwise. We disagree. In § 3559(c)(2)(F)(i), Congress specifically chose not to draw any distinction between simple and aggravated bank robberies—or between substantive and inchoate versions of these crimes—in defining the offenses that by definition constitute serious violent felonies for purposes of the enhanced sentencing mandate of § 3559(c)(1). This was consistent with its inclusion of § 2111, a robbery offense that does not distinguish between simple and aggravated robberies in its statutory definition of the prescribed conduct. Thus, for a bank robbery to qualify as a serious violent felony under § 3559(c)(2)(F)(i), the government is not required to prove the

aggravating element of § 2113(d). Proof of a conviction satisfying the simple robbery elements of § 2113(a) is sufficient. *See United States v. Brown*, 276 F.3d at 933 (noting that "federal 'three strikes' law does not alter the existing statutory definition of bank robbery").

■ In choosing which crimes would categorically qualify as serious violent felonies, Congress nevertheless concluded that, with respect to certain such crimes, for example, robbery, specific mitigating circumstances such as lack of firearm use or serious injury, would warrant relief from the statute's mandated punishment, even for repeat serious violent felony offenders. Plainly, Congress was not required to create this exception. *See United States v. Gray*, 260 F.3d at 1279 ("Congress could have enacted the three strikes statute independent of the disqualification provision, including only the statutory language defining all robberies as serious violent felonies."). Having done so, it was thus free to place the burden of proof for the exception where it wished, including on the defendant. *See Patterson v. New York*, 432 U.S. at 209, 97 S.Ct. 2319; *United States v. Williams*, 308 F.3d at 840; *United States v. Bradshaw*, 281 F.3d at 295; *United States v. Brown*, 276 F.3d at 932; *United States v. Gray*, 260 F.3d at 1278–79; *United States v. Gatewood*, 230 F.3d at 190–91; *United States v. Ferguson*, 211 F.3d at 887; *United States v. Smith*, 208 F.3d at 1190, *United States v. Kaluna*, 192 F.3d at 1196. As the Supreme Court observed in *Patterson v. New York*, "[t]o recognize ... a mitigating circumstance does not require the State to prove its nonexistence in each case in which the fact is put in issue." 432 U.S. at 209, 97 S.Ct. 2319. "The Due Process Clause ... does not put [a sovereign] to the choice of abandoning [affirmative] defenses or undertak-

ing to disprove their existence" in order to impose a punishment "which otherwise is within its constitutional powers." *Id.* at 207–08, 97 S.Ct. 2319.

Accordingly, like all other circuit courts to have considered the issue to date, we reject the argument that § 3559(c)(3)(A) violates due process because it imposes on a defendant seeking to avoid an otherwise mandated life sentence the burden of clearly and convincingly proving specified mitigating factors.

### 5. *Snype's Sentence Does Not Constitute Cruel and Unusual Punishment*

Snype argues that his life sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment because it is disproportionate to his crime of conviction. The argument is without merit.

■ "The Eighth Amendment 'forbids only extreme sentences that are "grossly disproportionate" to the crime.' " *United States v. Yousef,* 327 F.3d 56, 163 (2d Cir.2003) (quoting *Harmelin v. Michigan,* 501 U.S. 957, 1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring in part and concurring in the judgment) (quoting *Solem v. Helm,* 463 U.S. 277, 288, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983))). As the Supreme Court has itself observed, " 'outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare.' " *Ewing v. California,* 538 U.S. 11, 21, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003) (quoting *Rummel v. Estelle,* 445 U.S. 263, 272, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980)). The only such case in recent memory is *Solem v. Helm,* in which the Supreme Court vacated a life sentence without parole for a defendant convicted of passing a bad check for $100. Although the defendant had six

prior felony convictions, the Court noted that all were for relatively minor and non-violent offenses. *See* 463 U.S. at 296–97, 103 S.Ct. 3001.

■ Plainly, this case is not akin to *Solem.* Snype was convicted of conspiring to participate in an exceptionally violent robbery. Moreover, he committed this crime while on parole from another armed robbery for which he had served more than ten years in prison. As our earlier discussion shows, this last state robbery conviction followed two others for attempted robberies in which Snype, or at least a confederate, was armed. The gravity of Snype's crimes, combined with his stubborn record for recidivism even after long incarceration, supports the severe sentence imposed in this case. Snype presents as great a risk of recidivism and a likely greater risk to the safety of the community than the persistent felon whose Eighth Amendment challenge to a 25–year–to–life prison sentence was rejected by the Supreme Court in *Ewing v. California,* 538 U.S. 11, 123 S.Ct. 1179, 155 L.Ed.2d 108 (rejecting challenge to sentence imposed under state three-strikes law, where crime of conviction was non-violent theft of approximately $1200 worth of golf clubs from pro shop, following a rash of convictions for theft, burglary, possession of drug paraphernalia, robbery, trespassing, and firearm possession). His criminal conduct is as serious and his risk of recidivism demonstrably greater than that of the first-time drug offender whose Eighth Amendment challenge to a life sentence without parole was rejected in *Harmelin v. Michigan,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (upholding life sentence for possession of 672 grams of cocaine).

On the totality of circumstances, we reject Snype's claim that his sentence is constitutionally disproportionate to his crime.

## III. *Conclusion*

To summarize, we conclude that:

(1) any *Crawford* error in the admission of Marlo White's plea allocution was harmless beyond a reasonable doubt;

(2) the warrantless search of Jennifer Bean's apartment and the seizure of items therefrom was supported by a valid consent;

(3) the district court's failure *sua sponte* to redact a marriage certificate from which certain jurors inferred Snype's prior felony record neither (a) exposed the jury to extrinsic information nor (b) qualified as plain error given the overwhelming admissible evidence of guilt;

(4) Snype was not entitled to an accessory after the fact charge where no violation of 18 U.S.C. § 3 had been filed in his case; and

(5) Snype's life sentence comported with 18 U.S.C. § 3559(c) and did not violate the right to trial, due process, or the prohibition against cruel and unusual punishment.

AFFIRMED.