[Cite as *State v. Holland*, 2019-Ohio-2351.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28067 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-383 |
| | : | |
| LOUIS A. HOLLAND | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 14th day of June, 2019.

. . . . . . . . . .

MATHIAS H. HECK, JR., by SARAH E. HUTNIK, Atty. Reg. No. 0095900, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

CHRISTOPHER C. GREEN, Atty. Reg. No. 0077072, 130 West Second Street, Suite 830, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1}  After the trial court overruled his motion to suppress, Louis A. Holland pled no contest in the Montgomery County Court of Common Pleas to one count of having weapons while under disability (prior offense of violence), in violation of R.C. 2923.13(A)(2), a felony of the third degree.   The trial court sentenced him to community control for a period not to exceed five years.   For the following reasons, the trial court's judgment will be reversed, and the matter will be remanded for further proceedings.

## I. Factual Background

{¶ 2} The State presented two witnesses at the suppression hearing: Detective Melissa Schloss of the Dayton Police Department, and Detective Brad Daugherty of the Montgomery County Sheriff's Office, who was assigned to the Dayton Police Homicide Unit.   Holland called two individuals, Tonya Turner (Turner) and Erika Turner (Erika), whom the trial court generally did not believe.   The State's evidence, which the trial court credited, established the following facts.

{¶ 3} In late January 2018, homicide detectives Schloss and Daugherty were investigating the death of Michael Cook, which occurred in an alley near Brooklyn Avenue on January 27, 2018.   The detectives learned from Cook's family that Cook was trying to sell a shotgun and that Calvin Jones (whom the family knew) and another individual (whom the family did not know) had talked to Cook about the gun on the day before the murder.   Detectives located Jones and took him into custody; Jones had a firearm near his person that the police then believed was the murder weapon.

{¶ 4} During the detectives' interviews of Jones and another person (Taveon Hunt), a particular phone number repeatedly called Jones's and Hunt's phones.   The

detectives had obtained Cook's phone records, and the same phone number was the last number that had called Cook's phone prior to his death. Upon searching Facebook, the phone number was associated with the name "Allen Nonchalant"[1] with "Brooklyn Avenue" in parentheses. On January 28, 2018, detectives obtained several GPS locations for the phone associated with "Allen Nonchalant." From late January 28, 2018 to the morning of January 29, 2018, the phone was stationary at an address on Theodore Avenue. Detective Daugherty believed that whomever was in possession of the phone had spent the night at the Theodore residence.

{¶ 5} At approximately 8:45 a.m. on January 29, 2018, Detectives Schloss and Daugherty, two other detectives, a supervisor, and two uniformed officers went to the Theodore residence. Detective Daugherty testified that their goal was to identify "Allen Nonchalant" and determine whether that person was connected with Cook's homicide. Detective Daugherty knocked on the door, which was answered by Tonya Turner, the homeowner. Daugherty asked about the name Allen Nonchalant, and Turner indicated that her daughter and her daughter's boyfriend were there. Turner stated that her daughter was upstairs, and the boyfriend was in a back bedroom. Daugherty asked for permission to enter the residence to look for "Allen Nonchalant," and Turner agreed.

{¶ 6} Detective Schloss, Detective Daugherty, and Officer Gresham entered the residence. The door to the first-floor back bedroom was closed, and the detectives called out several times for "Allen" to come out; no one opened the bedroom door. With

---

[1] The trial court's decision spells the first name as "Allen" whereas the transcript spells it as "Alan." Neither Detective Schloss nor Detective Daugherty testified to the spelling of the name on Facebook, and there is no documentary evidence to indicate the correct spelling.

firearms in a "low ready" position, the officers opened the bedroom door; they found Holland on top of the bed with an infant. Detective Schloss testified that Holland had not consented to the officers' entry. Daugherty ordered Holland to raise his hands; Holland complied and got off the bed. Detective Daugherty entered the room, holstered his weapon, placed Holland in handcuffs, and patted him down. Schloss stood "right outside the room." Daugherty stated that another officer conducted a protective sweep to make sure no one else was in the room. Daugherty then took Holland outside to a cruiser.

{¶ 7} Detective Schloss then spoke with Turner. Schloss advised Turner that the officers were there in regards to a homicide investigation, and Schloss asked Turner who lived in the house. Turner told Schloss that she was the only person who lived at the house, but her daughter, Erika, and Erika's boyfriend had stayed the night. The detective asked Turner if the officers could search the residence, and the detective provided a consent to search form. Detective Schloss reviewed the form with Turner, explaining that Turner had the right to refuse the search. Schloss stated that Turner was "very cooperative," wrote her name at the top of the form, and signed and dated the form. The detective wrote what they were there for and the description of the house and signed it. Schloss testified that she made no threats or promises to Turner, and that Turner did not appear to be intoxicated or under the influence of drugs or alcohol. Schloss did not participate in the search of the house.

{¶ 8} After Detective Schloss obtained Turner's consent to search, the police officers "searched the residence to make sure there's no guns or anything in there." Turner had told the officers that she had a .45 caliber handgun in the back bedroom where Holland had been. Detective Daugherty returned to the back bedroom and searched

that room. The detective saw a closed (zipped) desert-camouflage backpack at the foot of the bed on the floor. Daugherty opened multiple compartments in the backpack and found marijuana and a .45 caliber handgun. Daugherty asked Turner if that was her gun, and she responded that it was not; Turner showed the officers where her gun was hidden in a dresser in the back bedroom. Turner also stated that she had an AK-47 rifle in the back bedroom, but the officers never located it. The officers found ammunition in the living room of the house.

{¶ 9} Detective Daugherty testified that the camouflage bag and its contents were seized and taken to the police station. Holland was also taken to the police station and interviewed. The recorded interview began at 10:13 a.m.; Daugherty advised Holland of his *Miranda* rights using a pre-interview form. Holland initialed next to each right to indicate his understanding and signed the form. Daugherty testified that he did not make any threats or promises to Holland, who did not appear to be under the influence of drugs or alcohol. Daugherty stated, and the video reflects, that Holland did not request an attorney.

{¶ 10} During the interview, Holland stated that the backpack was not his, but he used it sometimes. He told the detective that the backpack had been left at his residence around Christmas time, approximately a month prior to the interview. When asked how the backpack got to Turner's house, Holland responded that he had brought it there. Holland told Detective Daugherty that he put his Brisk drink in the large pocket of the backpack. After Detective Daugherty told Holland that the backpack also contained baggies and a .45 caliber High Point handgun, Holland acknowledged that the gun was his. He did not recall where he had gotten the gun, because he "had it so long."

{¶ 11} Tonya Turner testified on Holland's behalf. She indicated that Holland was in a relationship with her daughter, Erika, and was the father of her granddaughter. Turner testified that she resided on Theodore Avenue.

{¶ 12} According to Turner, on the morning of January 29, 2018, she was at home with her daughter, Holland, and her two grandchildren; Holland, Erika and the children had spent the previous night there. Turner testified that she was asleep when law enforcement knocked on her door, awakening her. She opened the door to three or four police officers. Turner stated that she "spoke with the lady, and she said who she was, and they asked was my daughter there." According to Turner, "a gentleman asked me was her boyfriend here, and I said yes, and he said where is he at." Turner testified that "first, I said they were upstairs. Then I said they were in the bedroom across the hall from [my bedroom]" on the first floor. Turner testified that Holland spent the night in the back bedroom on the first floor, and he was in that bedroom with her granddaughter when the police arrived.

{¶ 13} Turner stated that she "turned around to go, and they just came in." She denied that she had invited the officers into her home. After the officers entered, "[t]hey was like kept asking me * * * where my room was. And when I was going to show him, he pulled out a gun." According to Turner, the officers "went through my hallway and asked for somebody named Stephan," a name Turner did not recognize. No one responded to calls for "Stephan." At that point, an officer said, "This is the Dayton Police, come down with your hands up." Turner testified that the police had her sit in the living room, and she was unable to see anything else thereafter. Turner stated that Holland was subsequently removed from her home in handcuffs, along with a camouflage

backpack at the same time. Turner testified that the "lady police officer" asked to search her home "after they took out Mr. Holland and my daughter out of the house."

{¶ 14} On cross-examination, Turner testified that she allowed Holland to stay at her house "if he needs to." She testified that when she answered the door, the officers "asked about my daughter, and then they asked about her boyfriend. They never said his name." Upon questioning by the court, Turner stated that no one mentioned the name "Allen." Turner reiterated the she did not invite the police into her home. Turner testified that the "female" asked her to fill out a consent to search form after her daughter and Holland were removed from the house. Turner acknowledged that she told the officers she had a gun, and that it was located in the room occupied by Holland.

{¶ 15} When asked by the court about the circumstances under which Holland stayed at her home, Turner responded, "[l]ike if I have a dinner or something like that, they're allowed to stay over. We had a pizza party that night." She stated that Holland and her daughter had their own home elsewhere. When asked why Erika and Holland were in different bedrooms, Turner stated that Holland and her daughter were not married so they "can't sleep in the same room in my house."

{¶ 16} Finally, Erika Turner testified that she and Holland had two children together and were dating in January 2018, but were not dating at the time of the suppression hearing. In January 2018, she and Holland lived at their own residence, but they stayed overnight at her mother's house on January 28-29, 2018. Erika had slept in an upstairs bedroom while Holland slept in a first-floor bedroom across from her mother's bedroom.

{¶ 17} According to Erika, on the morning of January 29, she became aware that the police had come to her mother's house when they called for her to come downstairs.

Erika testified that she came downstairs with her daughter. When they came downstairs, the police had them sit on the steps "so they could escort Mr. Holland out." Erika saw that Holland was handcuffed when he was removed from the house. On cross-examination, Erika indicated that she had spoken with the police on January 27, 2018, about the homicide investigation, but she denied knowing why the police came to her mother's house. She also denied telling her mother and Holland that she had spoken to the police on January 27 about a homicide.

## II. Procedural History

{¶ 18} On February 21, 2018, Holland was indicted on one count of having weapons under disability. On March 16, 2018, Holland moved to suppress "[a]ny and all evidence obtained as a result of the search of the room Defendant was sleeping in," "[a]ny and all evidence obtained as a result of the search of the Defendant's backpack," and Holland's statements. The court held a hearing on the motion on April 19, 2018, during which the court received exhibits and heard testimony, as described above.

{¶ 19} The parties filed post-hearing briefs. Holland argued that he was an overnight guest at Theodore Avenue at the time of the search, that law enforcement conducted an unlawful search of his bedroom and of his backpack, and that he was unlawfully seized by law enforcement. Holland stated that his status as an overnight guest gave him a reasonable expectation of privacy in the bedroom. Holland argued that the officers' opening of the door of the bedroom where he slept was an unlawful search, and that he was seized without probable cause. Holland further argued that, because his statements were obtained through an unlawful search and unlawful seizure, they were subject to suppression. Holland claimed that Tonya Turner's consent to search the

bedroom where he slept was invalid because he was removed to "prevent him from objecting to the search of his bedroom." Finally, Holland asserted even "if consent to the search of * * * Theodore Ave[.] was lawfully obtained, that consent could not extend to Defendant's backpack."

{¶ 20} In its response, the State acknowledged that Holland was an overnight guest at Theodore Avenue. However, the State argued that opening the bedroom door did not violate Holland's Fourth Amendment rights. The State asserted that while "the actions of Det. Daugherty [did] no[t] fall under the *Maryland v. Buie* definition of a protective sweep because his actions were not performed after an arrest, he was acting reasonably. He acted as a reasonable police officer and opened the door to assess the situation for danger." The State asserted that since "Det. Daugherty had consent to be in the home, he knew there were at least two other people within the home that had yet to disclose themselves, and there was a closed bedroom in which persons could be hiding, he acted reasonably when he opened that door." The State further argued that the "search of the bedroom [where Holland had stayed] was valid because Tonya Turner had common authority over that room. It was her house." The State emphasized that Turner had informed officers that she kept her .45 caliber handgun in that room.

{¶ 21} Regarding the backpack, the State argued that Turner executed a broad consent that "reasonably extended to anywhere evidence regarding a homicide investigation could be located. Backpacks are used to transport items and they could be used to conceal weapons. Weapons are used in homicides. It would be reasonable for a consent search regarding a homicide investigation to include a backpack located inside a residence." Finally, the State asserted that Holland's statements were not obtained in

violation of his rights.

**{¶ 22}** On June 19, 2018, the trial court denied the motion to suppress. Regarding the credibility of the witnesses at the hearing, the court concluded that "the only portion of Tonya Turner's testimony that is credible was her testimony that Holland did not live at the home on Theodore, but instead was only at the home as a visitor on the evening of January 28 and the morning of January 29, 2018, and that Holland lived on Lorenz Avenue on the aforementioned dates." Otherwise, the court found "that Turner's testimony at the hearing was not credible." The court also found that other than Erika Turner's "testimony that she lived with Holland on Lorenz Avenue, and not at the Theodore address," Erika Turner's testimony "was not credible. The court gives no weight to the oral testimony of Tonya Turner or Erika Turner, except as noted."

**{¶ 23}** The court found that "the detectives had reasonable suspicion that Holland had been engaged in criminal activity sufficient to detain him for questioning. Holland's phone was the last that called the victim in a murder, shortly before the offense, and then called both of the suspects in the murder repeatedly while those suspects were being questioned by police." The court rejected Holland's argument that probable cause was required for his detention.

**{¶ 24}** The court next determined that "the State of Ohio has proven by clear and convincing evidence that Tonya [Turner] consented to the police officers and detectives entering her home to detain Defendant, Louis Holland. Still further, the officers' entry into the bedroom for purposes of a protective sweep was lawful, as the opening of the bedroom door to detain Holland was limited to securing his person and was not for purposes of a search of the bedroom." The court concluded that Daugherty's

"description of the opening of the door as a protective sweep, particularly since [Turner] acknowledged that Holland was in the bedroom and he would not come out despite numerous calls for him to do so, and given that Holland was suspected to have some knowledge or involvement" in a homicide investigation "is strongly supported by the evidence."

{¶ 25} The court found that "Holland's claim that he had a reasonable expectation of privacy in the Theodore Avenue property is a tenuous one. Nonetheless, the law enforcement officers on the scene obtained a valid consent to the search of the property by the sole resident of the property." The court found that the State had "proven by clear and convincing evidence that Ms. [Turner] consented to the search of the property on Theodore Avenue and that no other person present expressed a refusal to consent to the search. Holland was no longer present on the premises when the consent to search was sought or obtained." The court concluded that there was "no evidence to support Holland's claim that he was removed from the Theodore Avenue property to affect any potential consent to the search of the property; Holland's claim is speculative at best."

{¶ 26} With respect to the officers' search of the backpack, the court initially found that Holland had "disavowed ownership of the backpack." The court noted that "in order to have standing to challenge a search, the defendant must have a reasonable expectation of privacy in the evidence searched." The court found that Holland's "express disavowal of ownership of the backpack" supported the court's finding that he had failed to demonstrate that he had a reasonable expectation of privacy in the backpack "sufficient to invoke Fourth Amendment protections." The court concluded that "Holland had no reasonable expectation of privacy in a backpack he repeatedly claimed was not

his, and [Turner's] consent to the search of the residence was not limited in any manner."

**{¶ 27}** The court further denied Holland's request to suppress the statements he made.   Although the court found that Holland was in custody when he was questioned by police officers at the police department, the court concluded that Holland had knowingly, intelligently and voluntarily waived his *Miranda* rights and that his statements were made voluntarily.

**{¶ 28}** Holland subsequently entered a no contest plea, and the trial court found him guilty.   The court sentenced Holland to community control for a period not to exceed five years.   Holland appeals from the trial court's judgment, challenging the denial of his motion to suppress.

### III. Review of Trial Court's Suppression Ruling

**{¶ 29}** Holland's sole assignment of error states:

THE COURT ERRED WHEN IT OVERRULED THE DEFENDANT'S MOTION TO SUPPRESS WHEN IT FOUND THAT THE HOME-OWNER COULD GIVE CONSENT TO SEARCH THE BEDROOM AND/OR THE CONTENTS CONTAINED IN THE BEDROOM OF AN OVERNIGHT GUEST AND THAT THE DEFENDANT HELD NO LEGITIMATE EXPECTATION OF PRIVACY OVER THE CONTENTS OF HIS BEDROOM.

**{¶ 30}** Holland raises two issues related to his argument that the trial court erred in denying his motion to suppress.   First, he claims that he was an overnight guest and, therefore, he had a reasonable expectation of privacy in the residence and was afforded protection under the Fourth Amendment against unreasonable searches and seizures of

the bedroom in which he stayed. Second, he claims that Turner could not consent to the search of the bedroom in which he spent the night and/or of the contents in that bedroom, because he had a reasonable expectation of privacy over both the bedroom and the canvas bag.

{¶ 31} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

### A. Holland's Fourth Amendment Rights in Turner's Home

{¶ 32} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Fourth Amendment rights are personal in nature, and they may not be asserted vicariously by third parties. *Rakas v. Illinois*, 439 U.S. 128, 133-34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). "A person aggrieved by the introduction of evidence secured by an illegal search of a third person's premises or property has not suffered any infringement upon his Fourth Amendment rights." *State v. Henderson*, 2d Dist. Montgomery No. 22062, 2008-Ohio-1160, ¶ 9, citing *Rakas* at 134.

{¶ 33} Consequently, the person challenging the legality of a search bears the

burden of proving that he has a legitimate expectation of privacy in the place searched that society is prepared to recognize as reasonable. *See, e.g., Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (appellant lacked standing to bring Fourth Amendment challenge based on search of another person's home because he had no reasonable expectation of privacy therein); *Rakas* at 143; *State v. Williams*, 73 Ohio St.3d 153, 166, 652 N.E.2d 721 (1995). The individual must have a subjective expectation of privacy in the place searched, and that expectation must be objectively reasonable and justifiable. *Rakas* at 143; *State v. Buzzard*, 112 Ohio St.3d 451, 2007-Ohio-373, 860 N.E.2d 1006, ¶ 14.

{¶ 34} "A premises need not be one's home in order for one to have a legitimate expectation of privacy in that place. *Minnesota v. Olson*, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). In *Olson*, the United States Supreme Court held that an overnight guest may have a legitimate expectation of privacy in another's home even when his occupation of the premises is not exclusive. While the expectation generally attaches to one's home or residence, the fact that it does is not a bar to a reasonable expectation of privacy in other places that a person utilizes for residential purposes." *State v. Dooley*, 2d Dist. Montgomery No. 22100, 2008-Ohio-1748, ¶ 15. The *Olson* Court explained:

> To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society. We stay in others' homes when we travel to a strange city for

business or pleasure, when we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend.   We will all be hosts and we will all be guests many times in our lives.   From either perspective, we think that society recognizes that a houseguest has a legitimate expectation of privacy in his host's home.

From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. * * *

That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy. The houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest.   It is unlikely that the guest will be confined to a restricted area of the house; and when the host is away or asleep, the guest will have a measure of control over the premises.   The host may admit or exclude from the house as he prefers, but it is unlikely that he will admit someone who wants to see or meet with the guest over the objection of the guest.   On the other hand, few houseguests will invite others to visit them while they are guests without consulting their hosts; but the latter, who have the authority to exclude despite the wishes of the guest, will often be accommodating.   The point is that hosts will more likely than not respect the privacy interests of their guests, who are entitled to a

legitimate expectation of privacy despite the fact that they have no legal interest in the premises and do not have the legal authority to determine who may or may not enter the household. * * *

*Olson* at 98-100.

{¶ 35} The State concedes, and the record supports the conclusion, that Holland was an overnight guest at Turner's residence when the police entered Turner's home. Accordingly, Holland had a reasonable expectation of privacy in Turner's home when the officers entered, and he had standing to challenge the officers' actions within the home.

**B. The Officers' Entry into the Residence**

{¶ 36} "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment was directed." (Citation omitted.) *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable, subject only to a few specifically established and well delineated exceptions. *Id.* at 586. One such exception concerns searches that are conducted with the consent of an owner or an occupier. *State v. Posey*, 40 Ohio St.3d 420, 427, 534 N.E.2d 61 (1988), citing *Maryland v. Macon*, 472 U.S. 463, 469, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985). *See also Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (consent can be given "from a third party who possesses common authority over the premises").

{¶ 37} Under the consent exception, the prohibition against a warrantless entry into a home does not apply to situations in which voluntary consent has been obtained, either from the individual whose property is searched or from a third party who possesses

common authority over the premises. *Rodriguez* at 181. When multiple people have authority to allow entry into a home, the voluntary consent of one person who possesses common authority over premises "is valid as against an absent, nonconsenting person with whom that authority is shared." *United States v. Matlock*, 415 U.S. 164, 170, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

{¶ 38} In this case, multiple police officers went to Tonya Turner's residence in the hopes of locating "Allen Nonchalant." Detective Daugherty knocked on the door, which was answered by Turner, the homeowner. Holland was in a first-floor back bedroom with the door closed, and Erika, Turner's daughter, was in an upstairs bedroom. Turner orally consented to the officers' entry into the home. Under these circumstances, regardless of Holland's status in the home, the trial court properly concluded that the officers lawfully entered the home based on Tonya Turner's consent.

## C. The Officers' Search of the Backpack

{¶ 39} Holland argues that, because he was an overnight guest, Turner did not have the authority, against his wishes, to allow the officers to enter the back bedroom to which he had been assigned to sleep. He further claims that, after he was removed from the home, Turner could not consent to the officers' search of the bedroom and its contents, including the backpack. In this case, we need not determine whether the officers had authority to enter the bedroom in light of Holland's implicit objection to the officers' entry or whether Turner validly consented to the officers' search of the back bedroom after Holland was removed from the home. Regardless of the outcome of those issues, we conclude that Turner did not have the authority to consent to Detective Daugherty's search of the backpack.

{¶ 40} In concluding that the officers lawfully searched the backpack, the trial court found that Holland's "express disavowal of ownership of the backpack supports the court's finding that he has failed to demonstrate that he had a reasonable expectation of privacy in the backpack sufficient to invoke Fourth Amendment protections. Holland had no reasonable expectation of privacy in a backpack he repeatedly claimed was not his, and Tucker's consent to the search of the residence was not limited in any manner."

{¶ 41} A person's legitimate expectation of privacy is not governed by common law interests in real or personal property. *Rakas*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387, n.12. "[O]ne who owns or *lawfully possesses or controls* property will in all likelihood have a legitimate expectation of privacy by virtue of [the] right to exclude." (Emphasis added.) *Id*.; *see also, e.g., People v. Mead*, __ N.W.2d __, 2019 WL 1769597 (Mich.2019). Accordingly, we agree with Holland that the trial court erred in focusing solely on whether Holland owned the backpack and in not considering whether he lawfully was in possession of the backpack.

{¶ 42} The testimony at the suppression hearing established that detectives were aware that Holland's cell phone was located at Turner's residence overnight. After entering Turner's home, they located Holland in a back bedroom across from Turner's bedroom. When they entered the room, Holland was lying on the bed. A backpack was located at the foot of the bed on the floor. There is no evidence that, prior to the search of the backpack, the officers asked Turner or Holland to whom the backpack belonged.

{¶ 43} Detective Daugherty asked Holland about the backpack at the police station. Daugherty specifically asked, "Whose bag is that?" Holland responded, "It's not my bag, just a bag I sometime use." Daugherty then asked Holland how the

backpack got into Turner's home. Holland told the detective, "I brought it over there. When asked if he looked in the bag, Holland stated that he put his Brisk drink in the big pocket area. Holland acknowledged that the bag felt heavy and that there was "Bud" (presumably marijuana) inside. Holland denied knowledge of other items in the backpack when Daugherty noted that the backpack also contained baggies of marijuana and a .45 High Point hand gun. Holland answered affirmatively when asked if the gun belonged to him. When asked where he got the gun, Holland replied that he did not remember, because he had had it a long time.

{¶ 44} Although Holland denied ownership of the backpack, the evidence at the suppression hearing established that Holland possessed the backpack at the time of the search. Holland had put personal items inside the backpack and brought the backpack to Turner's residence. The backpack was found at the foot of the bed where Holland was lying when the police arrived. Accordingly, Holland had a reasonable expectation of privacy in the backpack. The police officers' removal of Holland from the bedroom, in handcuffs, did not reduce his expectation of privacy in the backpack.

{¶ 45} We therefore turn to whether Tonya Turner, as the homeowner of the residence in which Holland was an overnight guest, had the authority to consent to the search of Holland's backpack as part of her overall consent to search the house. We conclude she did not.

{¶ 46} As stated by the Seventh District:

It is well established that an individual has a heightened expectation of privacy in the contents of a closed container. *See, e.g., United States v. Chadwick*, 433 U.S. 1, 13, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

Luggage, handbags, paper bags, and other containers are common repositories for one's papers and effects, and the protection of these items from state intrusion lies at the heart of the Fourth Amendment. U.S. Const., Amdt. 4 ("The right of the people to be secure in their ... papers, and effects, against unreasonable searches and seizures, shall not be violated"). By placing his possessions inside a container, an individual manifests an intent that his possessions be "preserve[d] as private," *United States v. Katz*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and thus kept "free from public examination." *Chadwick*, at 11, 97 S.Ct. 2476. If an object is in a closed container, the object "is not in plain view and the container may not be opened unless the packing gives away the contents." Katz Ohio Arrest, Search and Seizure (1997 Ed.) 214, Section 13.01 at 221, citing *United States v. Williams*, 41 F.3d 192 (4th Cir.1994), certiorari denied (1995), 514 U.S. 1056, 115 S.Ct. 1442, 131 L.Ed.2d 321.

*State v. Johnson*, 2017-Ohio-5708, 93 N.E.3d 1261, ¶ 21 (7th Dist.).

{¶ 47} A third-party's consent to search the property of another is based on common authority over the property. *Matlock*, 415 U.S. at 171, 94 S.Ct. 988, 39 L.Ed.2d 242, fn. 7. The State bears the burden of establishing that common authority exists. *Rodriguez*, 497 U.S. at 181, 110 S.Ct. 2793, 111 L.Ed.2d 148.

{¶ 48} An objective standard is used to decide if third-party consent is valid. *State v. Holloway*, 2d Dist. Clark No. 2017-CA-91, 2018-Ohio-4636, ¶ 29. A third-party's consent is valid if "an officer looking at the then-available facts could reasonably conclude that the third-party had apparent authority to consent. An officer's belief is unreasonable

if the surrounding circumstances would lead a reasonable person to doubt the authority of the third party." *State v. Bradley*, 2017-Ohio-9224, 102 N.E.3d 618, ¶ 18 (2d Dist.), citing *Rodriguez* at 186, 188.

{¶ 49} We find *United States v. Salinas-Cano*, 959 F.2d 861 (10th Cir.1992) to be instructive. In *Salinas-Cano*, the defendant left his suitcase in his girlfriend's apartment, where he spent several nights each week as her guest. The girlfriend was the sole lessee and tenant of the apartment. After observing Salinas-Cano going in and out of the girlfriend's apartment and conducting a controlled buy, officers went to the girlfriend's apartment and asked for permission to search it. The officers told the girlfriend that they were interested in Salinas-Cano's possessions. Officers located and opened Salinas-Cano's suitcase, which contained cocaine.

{¶ 50} Upon review, the Tenth Circuit reversed the district court's denial of Salinas-Cano's motion to suppress. First, the Tenth Circuit noted that "there is simply no evidence in this record that [the girlfriend] exercised mutual use or possessed the joint interest and control over the suitcase necessary to legitimize her consent to search it." *Id.* at 865. Moreover, the Tenth Circuit concluded that the officers could not rely on apparent authority of the girlfriend, noting that whether the girlfriend had mutual use of the suitcase could not be determined by anything the agents asked. The court rejected a finding of apparent authority based solely on the girlfriend's control of the residence. It reasoned: "To hold that an officer may reasonably find authority to consent solely on the basis of the presence of a suitcase in the home of another would render meaningless the Fourth Amendment's protection of such suitcases. We hold that the police 'could not infer such authority merely from [the consenter's] ownership of the house.' " *Id.* at 866,

quoting *State v. Whitfield*, 939 F.2d 1071, 1075 (D.C.Cir.1991).

{¶ 51} The Seventh District similarly concluded in *Johnson,* 2017-Ohio-5708, 93 N.E.3d 1261, that a host's consent for officers to search a residence did not grant authority to the officers to search a guest's closed book bag. In *Johnson*, the police went to a trailer to execute an arrest warrant for the resident's son. They also brought an arrest warrant for Johnson, who was known to associate with the son. Upon entering the trailer, the officers arrested Johnson and the son; Johnson was located in the trailer's bedroom. After both men were removed to cruisers, the resident executed a consent to search form. An officer returned to the bedroom where Johnson had been found and observed an unopened black book bag on the bed; a detective testified at the suppression hearing that Johnson was known to carry a black book bag and had previously been arrested with a black book bag. The officer searched the book bag while Johnson was seated in the cruiser.

{¶ 52} On appeal, the Seventh District reviewed whether the resident validly consented to the search of the book bag over which she had no actual authority. The appellate court recognized that individuals have "a heightened expectation of privacy in the contents of a closed container." *Id.* at ¶ 21. It noted, however, that federal appellate courts have taken differing approaches as to whether the State or the defendant should bear the risk when there is uncertainty to whom the property belongs.

> The split in the Circuits on this issue is apparent. For instance, in *United States v. Peyton*, 745 F.3d 546, 554 (D.C. Cir. 2014), the D.C. Circuit held that apparent authority does not exist where it is uncertain that the closed container, in that case, a shoe box, is subject to mutual use. The

Seventh Circuit, on the other hand, concluded the risk of uncertainty regarding a closed container should be borne by the defendant, not the police. Thus, a person with common authority over the premises is presumed to have authority over closed containers found there, unless the police receive positive information to the contrary. *United States v. Melgar*, 227 F.3d 1038, 1041 (7th Cir. 2000). Similarly, the Second Circuit has held that a lessee has authority to consent to the search of all closed containers within an apartment except those that obviously belong to someone else. *United States v. Snype*, 441 F.3d 119, 136 (2d Cir. 2006).

*Id.* at ¶ 23. The Seventh District found the approach in *Peyton* persuasive and concluded that the officer's search of the book bag was unlawful, given the officers' awareness that the book bag might belong to Johnson. *Id.* at ¶ 24. The court concluded that the resident's request to the police that they remove any contraband in the residence "cannot create common authority over the bag where none existed prior to her request." *Id.*

{¶ 53} In this case, the detectives were aware from pinging Holland's phone that the phone had remained at the residence overnight. When they spoke with Tonya Turner, the resident, they learned that Holland was staying in a back bedroom. Upon entering the room, they found Holland lying on the bed with a child. The backpack was located at the foot of the bed on the floor. The police officers did not ask Turner whether the backpack belonged to her, and the factual circumstances reasonably indicated that the backpack belonged to Holland. Holland did not abandon the backpack, and he made no statements disavowing ownership or possession of the backpack prior to the search. Moreover, the fact that the officers removed the backpack from the residence and

questioned Holland about the backpack at the police station indicates that the officers also subjectively believed that the backpack belonged to Holland. Holland subsequently acknowledged that he possessed and used the backpack. Under these specific circumstances, Turner lacked either actual or apparent authority to consent to the search of the backpack, even though it was located in her residence. Consequently, the detective's search of the backpack without a warrant or consent by Holland was unlawful.

{¶ 54} Holland's assignment of error is sustained.

## IV. Conclusion

{¶ 55} The trial court's judgment will be reversed, and the matter will be remanded for further proceedings.

. . . . . . . . . . . . .

TUCKER, J., concurs:

{¶ 56} The issue in this case arose because there was an open-ended consent to search provided by a homeowner or lessor (hereinafter homeowner) and the person asserting the privacy interest was an overnight or temporary guest; there is ambiguity concerning a homeowner's authority to allow law enforcement officers to open and search a closed container encountered during the search. I conclude, based upon the specific facts of this case, that there was uncertainty concerning Turner's authority to allow the backpack to be opened and searched, and that this uncertainty required resolution before the detectives proceeded with the search of the backpack. I therefore concur in the result reached by the majority opinion.

{¶ 57} The case law reveals two basic approaches to the analysis. The first is

premised on the notion that, when the person giving consent is a homeowner and the person asserting the privacy interest is an overnight guest, there can be no dispute that the consent came "from an individual who had the access and authority necessary to consent to a search of the entire premises." *United States v. Snype*, 441 F.3d 119, 136 (2d Cir.2006). Uunder this approach, an "open-ended consent to search would permit the search and seizure of any items [including a closed container] with the exception of those 'obviously' belonging to another person." *Id.*, quoting *United States v. Zapata-Tamallo*, 833 F.2d 25, 27 (2d Cir.1987). *See also United State v. Melgar*, 227 F.3d 1038 (7th Cir.2000) (resolution of any ambiguity regarding the homeowner's consent authority appropriately resolved against the defendant).

{¶ 58} The second approach is rooted in the notion that closed containers (especially luggage, footlockers, backpacks, and the like) "historically command a high degree of privacy" protection. *United States v. Waller*, 426 F.3d 838, 848 (6th Cir.2005), quoting *Salinas-Cano*, 959 F.2d 861, 864. Under this approach, when it is unclear whether a homeowner's authority to consent extends to a closed container, the police must refrain from opening and searching the container until the situation is clarified. If, upon investigation, it is determined that the authority to consent does not extend to the closed container, a warrant to allow the search may be sought. *Waller* at 849; *United States v. Taylor*, 600 F.3d 678 (6th Cir.2010); *Johnson*, 2017-Ohio-5708, 93 N.E.3d 1261.

{¶ 59} Reasonableness, as it is often said, is the "ultimate touchstone" when conducting a Fourth Amendment analysis. *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). "An action is 'reasonable' under the Fourth Amendment, regardless of an individual officer's state of mind, as long as the

circumstances, viewed <u>objectively</u>, justify the action." (Emphasis sic.) *Id.* at 404, quoting *Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978).

{¶ 60} I conclude that the second, more cautious approach, is the more reasonable way to conduct the analysis. The nature of the item and its location when discovered will, in most cases, demonstrate whether, viewed objectively, there is ambiguity regarding the homeowner's authority to allow the container to be opened and searched. In this case, based upon the nature of the item, a closed backpack, and its location, the bedroom where the detectives found Holland, there was, viewed objectively, uncertainty whether Turner had authority to permit the search of the backpack. Accordingly, the detectives acted unreasonably when they opened and searched the backpack. I therefore concur in the majority opinion.


HALL, J., concurs:

{¶ 61} I concur in Judge Donovan's opinion and in Judge Tucker's concurring opinion.

. . . . . . . . . . . .


Copies sent to:

Mathias H. Heck, Jr.
Sarah E. Hutnik
Christopher C. Green
Hon. Mary Katherine Huffman